# Illinois Official Reports

## Appellate Court

---

### *People v. Harris*, 2021 IL App (1st) 182172

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RALPH HARRIS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-2172 |
| Filed | March 5, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 95-CR-27596, 95-CR-27598, 95-CR-27600; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Charles W. Hoffman, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Myles P. O'Rourke, Special State's Attorney, of Chicago (Andrew N. Levine, Ariel Yang Hodges, Elisabeth Gavin, and Lawrence Rosen, Assistant Special State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Connors and Oden Johnson concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Ralph Harris, filed a postconviction petition alleging that his pretrial statements were the product of police coercion, and for relief, he requested a new suppression hearing. In his petition, defendant alleged that he has new evidence of a pattern and practice of torture and physical abuse at a Chicago Police Department station (Area 2) involving Detective Michael McDermott, who was one of his arresting officers and one of the detectives investigating his cases. After an evidentiary hearing, the circuit court denied the postconviction petition. On appeal, defendant contends that the court's determination was error because his new evidence, when weighed against the testimony presented by the State at his pretrial suppression hearing, likely would have changed the outcome of his suppression hearing. For the following reasons, we reverse and remand the cause for a new suppression hearing.

¶ 2                                    I. JURISDICTION

¶ 3        The trial court's order denying postconviction relief was entered on September 21, 2018. A notice of appeal was filed that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651 (eff. Feb. 6, 2013), governing appeals in postconviction proceedings.

¶ 4                                    II. BACKGROUND

¶ 5        In 1995, defendant was charged in three separate cases (95 CR 27596 (the Ford case), 95 CR 27598 (the Patterson case), and 08 CR 10783 (the RT case)), with offenses including murder, attempted murder, aggravated criminal sexual assault, and armed robbery. The complete background of those cases can be found in *People v. Harris*, No. 1-05-0320 (2005) (unpublished order under Illinois Supreme Court Rule 23) (Ford), *People v. Harris*, No. 1-05-0323 (2005) (unpublished order under Illinois Supreme Court Rule 23) (Patterson), and *People v. Harris*, No. 1-08-2410 (2010) (unpublished order under Illinois Supreme Court Rule 23) (RT). For purposes of this appeal, we set forth only those facts pertaining to defendant's motion to suppress.

¶ 6        On June 10, 1998, defendant filed an omnibus motion to suppress his confessions in these cases prior to trial. In his amended motion to suppress, defendant alleged, among other claims, that (1) his statements were obtained as a result of interrogation that took place after he elected to remain silent and/or requested an attorney, (2) detectives showed him Polaroids of Patrick Brunt "with their arms around him and telling the defendant that he would bury him," (3) his statements were obtained as a result of physical coercion, specifically Detectives Boyle and McDermott "hit the defendant with their fists in the stomach, and also about the head and neck. They also placed a gun to his head and mouth and hit him with a phone book," and (4) his statements were the result of psychological and mental coercion where Detective John Yucaitis told him that he would arrest and charge Angie Clark, defendant's girlfriend, and place her children with the Department of Children and Family Services (DCFS).

¶ 7        At the pretrial suppression hearing, Detective McDermott testified that on August 29, 1995, he arrived at a garden apartment located at 3601 West 79th Street in Chicago. He was accompanied by his partner, James Boylan, and Detective Hamilton. They knocked on the door, and a female voice inside asked, "who is it." They responded, "the police" and the door

- 2 -

started to open. McDermott heard a male voice inside say "don't let them in or something to that effect." When the door opened, they saw a woman with a man behind her. McDermott recognized the man as defendant, "the individual they were looking for."

¶ 8    The police ordered defendant to show his hands and get to the ground. Defendant did not comply, so the officers, with their "guns out, continued to approach the both of them. They were backing up." The officers continued their approach, "continuing yelling at them," and at some point "we all kind of jumped on [defendant]." They pushed the woman aside and "fell on top of him, start trying grabbing [*sic*] his arms trying to force him to the ground." They eventually got him to the ground and handcuffed him. Detective Hamilton took defendant to Area 2 headquarters.

¶ 9    McDermott testified that, after defendant was taken to Area 2, he saw him "off and on" and had contact with him "at about 9, 10, 11 o'clock" that morning. Before he saw defendant in the interview room, McDermott spoke with Detective Hamilton, who said that defendant told him about "a shooting robbery that occurred at 101st and Wallace and the victim's last name was Brown." McDermott and Boylan then had a brief five-minute conversation with defendant.

¶ 10    McDermott saw defendant again 13 or 14 hours later, at midnight or 1 a.m. Around that time, McDermott spoke with Detective Yucaitis, who had some information regarding a possible murder weapon. McDermott checked on the information, and when it was verified, he "poked [his] head into the room" and told Yucaitis. Defendant was in the room at the time. McDermott left and had no further contact with him. In his presence, defendant never stated that he wanted to remain silent, nor did he ask for an attorney. McDermott denied that he or Boylan hit defendant in the stomach, head, and neck with their fists. He denied that he or Boylan put a gun in defendant's mouth or hit him with a phone book. McDermott never heard Yucaitis threaten to arrest defendant's girlfriend, Angie Clark, or threaten to place her children with DCFS.

¶ 11    McDermott acknowledged that he and Boylan knew defendant from a prior encounter. On April 4, 1991, McDermott arrested defendant, and he was subsequently charged with two counts of armed robbery. He had "robbed and shot at one of my sergeants from Area Two." McDermott investigated that case, and defendant pleaded guilty.

¶ 12    On cross-examination, McDermott did not recall whether defendant was only wearing boxer shorts when the officers entered the apartment on August 29, 1995. He could not tell whether defendant had a gun because he could not see his hands. When asked whether defendant threatened the officers, McDermott responded, "He was threatening in not complying with our orders, yes. But did he physically assault us? No." While defendant did not comply with their orders, "he didn't verbally threaten [the officers]." McDermott stated that the situation was "stressful." Although the officers were not in uniform, McDermott "was pretty sure [defendant] knew who I was" due to their involvement with each other in 1991. McDermott brought the woman, Clark, to the station. She agreed to come and was never placed under arrest.

¶ 13    McDermott verified on cross-examination that he had contact with defendant at Area 2 twice from August 29, 1995, to the early morning hours of August 30, 1995. The first "was earlier during the day. It could be between nine and eleven. I'm not sure exactly what time. We were up all night. The other one was after midnight, yes." After that, McDermott only had

contact with defendant when he escorted him to the bathroom or to other rooms in the station or when he assisted in the lineups.

¶ 14    McDermott acknowledged that he had his gun on him when he entered the room to speak with defendant. Defense counsel asked, "based on your contacts in the past with Mr. Harris, you didn't like Mr. Harris, isn't that correct?" The State objected, and the trial court sustained the objection at first. The court, however, changed its mind and allowed McDermott to answer.

> "A. Although he cooperated in the '91 case and in the '95, case as a person I think he's evil, you know. He's a bad person.
>
> Q. And, wouldn't the fact that he shot at a fellow officer exaggerate your feelings of dislike for Mr. Harris?
>
> A. I think he is extremely dangerous. We tried to gain his confidence. That's one of the reasons we let Detective Hamilton talk to him because they kind of hit it off together."

¶ 15    Detective Boylan's testimony at the suppression hearing corroborated the testimony of McDermott.

¶ 16    Detective John Yucaitis testified at the pretrial hearing that on August 29, 1995, he was at Area 2 and around 6:45 p.m. he left to get pizzas. He returned with the pizzas around 8:30 p.m., and he talked with officers who told him that defendant was cooperating and giving them information about robberies he had committed. When Yucaitis brought him pizza around 8:30 to 8:45 p.m., defendant asked why Patrick Brunt was at the police station. Yucaitis stepped out of the room and saw McDermott and Boylan with Brunt by the water fountain. Yucaitis believed they were taking Brunt to the bathroom.

¶ 17    Yucaitis informed defendant that, since he had invoked his right to remain silent, Yucaitis was told not to talk to him. Defendant stated he wanted to talk, and Yucaitis read him his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant agreed to talk, and he asked to see Detective Hamilton. With Yucaitis present, he told Detective Hamilton about a murder that occurred on Greenwood. Around 10 p.m., Assistant State's Attorney (ASA) Tom Darman arrived. Sometime between midnight and 1 a.m., defendant gave an oral statement to ASA Darman. When Darman left the room, Yucaitis asked defendant about the location of the gun. He said it was at a friend's house, and Yucaitis relayed that information to McDermott. Yucaitis was present when defendant gave his handwritten statement.

¶ 18    Yucaitis testified that defendant never asked for an attorney. He never saw McDermott or Boylan hit defendant in the stomach, head, or neck with their fists. Defendant did not tell him that they placed a gun on his head or hit him with a phone book. Yucaitis also denied saying he would arrest and charge Clark or that her children would be placed with DCFS. He denied showing defendant a Polaroid of Brunt with an officer's arms around him.

¶ 19    On cross-examination, Yucaitis stated that he was told not to talk to defendant because he had "invoked his rights and they didn't want to screw up the case." Yucaitis also stated that, when he brought the pizza, he opened the door and defendant looked out and said, "what's Brunt doing here."

¶ 20    Detective John Hamilton testified at the pretrial hearing that he spoke briefly with defendant around 1 a.m. on August 29, 1995, after he was arrested. Detective Hamilton first had a conversation with defendant at Area 2 around 1:30 a.m. Detective Hamilton spoke with defendant "on or off for several hours" during which time defendant gave oral admissions on

- 4 -

three sexual assault cases. Later that morning, around 7:30 a.m., witnesses came to the station to view lineups. During breaks between lineup viewings, Detective Hamilton spoke with defendant. Around 9 or 10 a.m., he made a statement about the armed robbery shooting of James Brown and Detective Hamilton relayed this information to McDermott and Boyle "because they were familiar with the case." ASA Leslie Quade then spoke with defendant around 3:30 p.m., but he was not present during that conversation. When ASA Quade came out of the room, she informed Detective Hamilton that defendant had requested an attorney. At that time, their conversation terminated.

¶ 21    Around 8:30 p.m. that evening, Detective Hamilton spoke again with defendant. Detective Yucaitis had called him into the interview room because defendant told Yucaitis that he wanted to talk to Detective Hamilton. With Yucaitis present, defendant told him that he wanted to talk about a murder. Detective Hamilton stopped the conversation, reminding defendant that he had asked for an attorney. Defendant said he wanted to talk, and he was given his rights again. He then made statements about the murder on Greenwood.

¶ 22    Detective Hamilton saw defendant again on September 22, 1995, when he was brought back to the station to participate in lineups. That evening, defendant gave oral statements regarding a number of cases they were investigating. Detective Hamilton stated that he was not aware of a Polaroid of Patrick Brunt, nor did he see anyone show defendant a Polaroid of Brunt or tell defendant he would be buried. He did not see McDermott or Boylan hit defendant in the stomach, head, or neck with their fists, place a gun to his head or in his mouth, or hit him with a phone book. Detective Hamilton stated that he did not hear Yucaitis tell defendant that he would arrest and charge Angie Clark if he did not give a statement. He did not hear Yucaitis tell defendant that he would have Clark's children placed with DCFS.

¶ 23    On cross-examination, Detective Hamilton confirmed that he spoke with defendant around 1:30 a.m. After he made statements about the three sexual assault cases, "[t]here was a lot of stuff going on. They were so many cases, we were pulling reports, attempting to contact victims." This occurred between 3 and 4 a.m. Detective Hamilton stated that between 1:30 and 4 a.m., he "left and re-entered [the interrogation room] several times." He acknowledged that he did not take notes when defendant gave his oral statements because he "was familiar with the case." From 3 or 4 a.m. until 7 a.m., he remained in the area and did not see anyone enter the interrogation room. Detective Hamilton recalled that McDermott and Boylan were at the station in the early morning hours.

¶ 24    Around 3 or 3:30 p.m. that afternoon, ASA Quade informed him that defendant had asked for an attorney. He did not speak to defendant again until around 8:30 pm, after Yucaitis had come back with pizzas. Yucaitis called from the room that defendant wanted to talk to Detective Hamilton. He wanted to talk about a murder, but Detective Hamilton reminded him that he had asked for an attorney. Yucaitis then said, "yeah, we just discussed that. I readvised him of his rights. He doesn't want a lawyer." Before speaking with defendant, Detective Hamilton did not advise him of his rights "because Detective Yucaitis just advised me that he had done that, and I verified it by asking [defendant]."

¶ 25    Defendant did not testify at the suppression hearing. After closing arguments, the trial court denied the motion to suppress.

¶ 26    The case proceeded to trial, and defendant was found guilty in all three cases. He was sentenced to death in the Ford and Patterson cases and received sentences totaling 120 years' imprisonment in the RT case. After his convictions were affirmed on direct appeal, defendant

filed postconviction petitions asserting that newly discovered evidence corroborated his claim that his confessions were obtained through coercion and torture. The circuit court advanced the petitions to third-stage postconviction proceedings and ordered a combined evidentiary hearing for the three petitions.

¶ 27 Pursuant to motions *in limine* filed by the parties, the circuit court ruled that the evidentiary hearing would be "confined to what [petitioner's] new information is, what [the State's] rebuttal evidence is to your new evidence, and then comparing that to the evidence that was offered 20 years ago at the original suppression hearing."

¶ 28 The evidentiary hearing began on June 21, 2018. Defendant first presented evidence for the limited purpose of showing that he has consistently and repeatedly alleged that he was physically abused by McDermott and Boylan at Area 2 on August 29-30, 1995. Along with his amended pretrial motion to suppress statements, defendant presented his February 25, 1999, trial testimony in the Patterson case (95 CR 27598).

¶ 29 He testified that around 1 a.m. on August 29, 1995, he was at 3601 West 79th Street, which was an apartment he shared with Angela Clark. At the time, they were sleeping. There was a knock at the door, and Clark got out of bed first. She was wearing a nightgown, and defendant was wearing boxer shorts. He heard a voice saying that it was the police. Clark started to open the door and then "the door just crashed in, knocked her back into me the police came in with weapons drawn. He heard, "Put your motherf*** hands up. I am going to kill you." They knocked down Clark and attacked him "with guns out." They threw him to the ground, put a knee to his back and neck, and pointed a gun at him. Defendant was then handcuffed.

¶ 30 When they got to Area 2, Detective Hamilton and another detective took him to an interview room. Defendant was handcuffed to a loop in the room. After Detective Hamilton brought him to the room, he was left alone. McDermott and Boylan were the first detectives to come in and talk to him. They said, "How you doing, Ralphy boy? You thought we forgot about you? You thought [we] forgot about what you did to Rudy?" McDermott then grabbed defendant near the throat and pushed him against the wall. McDermott punched him in the stomach and told him they would put him in the penitentiary forever.

¶ 31 After they left, Detective Hamilton came in and started questioning defendant about a murder. Defendant said he did not want to talk and that he wanted a lawyer. He testified that he talked to Hamilton after the first time McDermott and Boylan came into the room. Detective Hamilton never hit him.

¶ 32 After defendant spoke with Detective Hamilton, McDermott and Boylan came back and "smacked" and "choked" him. They told him that he was going to cooperate with them and that he had information about murders they were investigating. Later that afternoon, defendant saw ASA Quade. When he asked for an attorney, ASA Quade stopped talking to him. Detective Hamilton then came in and told defendant that McDermott and Boylan "really wanted [him]" and there was nothing he could do for defendant unless he cooperated with Hamilton and "do what they want you to do." Detective Hamilton then asked him if he knew about some murders. He told him that he did not.

¶ 33 McDermott and Boylan came in a third time. McDermott grabbed defendant's arm and choked and hit him. Afterward, Detective Hamilton came in with blank pieces of paper and told him they would arrest Clark. When defendant refused to talk, Hamilton left, and McDermott and Boylan returned. McDermott sat in a chair and pointed a gun toward

defendant's face. He grabbed him by the throat and pointed the gun at his head, telling him, "I am going kill [*sic*] you." He also forced the gun into defendant's mouth.

¶ 34 Detective Yucaitis came in after this fourth visit by McDermott and Boylan. He told defendant that he was going to jail and he would be taking Clark down with him. Detective Hamilton returned with blank pieces of paper. He told defendant that he could not help him unless he did what they wanted him to do. Defendant signed the bottom of the paper as Detective Hamilton told him to do. ASA Quade was not present in the room during this time. Defendant did not tell her about what happened with McDermott and Boylan.

¶ 35 Defendant presented the testimony of McDermott, Boylan, Yucaitis, and Hamilton that was given at the hearing on his amended motion to suppress, as set forth above.

¶ 36 He also presented new evidence to support his assertion that there was a decades-long pattern and practice of physical abuse and torture committed by Area 2 detectives under Jon Burge, including:

Exhibit 4: the 2006 report of Special State's Attorneys (SSA) Egan and Boyle on allegations of torture, perjury, obstruction of justice, and other offenses under the command of Jon Burge at Area 2. The report concluded that Burge was guilty of "prisoner abuse" and "[i]t necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity so could they." Report of the Special State's Attorney at 16, *In re* Appointment of Special Prosecutor, No. 2001-Misc-4 (Cir. Ct. Cook County, July 19, 2006) (2006 Report), available at http://www.aele.org/law/2006LROCT/chicagoreport.pdf [https://perma. cc/ZW5U-YNR8].

Exhibit 14: the City of Chicago's "Reparations for Burge Torture Victims" ordinance and the city council's Resolution for Burge Torture Survivors, May 6, 2015, in which the city apologized for the acts of torture committed by Burge and others under his command. Chicago Ordinance 2015-2687 (adopted at Chi. City Clerk J. Proc. 107,714 (May 6, 2015)); Chicago Resolution 2015-256 (adopted at Chi. City Clerk J. Proc. 107,717 (May 6, 2015).

Exhibit 29: *In re Charges Filed Against Commander Jon Burge, Star No. 338*, Nos. 91-1856, 91-1857, 92-1858, Chicago Police Bd. (Feb. 11, 1993). The matter included charges against Patrick O'Hara and John Yucaitis. Burge and Yucaitis were disciplined for the torture of Andrew Wilson at Area 2 on February 14, 1982. Burge was fired, and Yucaitis was suspended for 15 months for failing to take action to stop the torture, or secure medical care for Wilson, and failing to report Burge's actions to his commanding officer or others at the police department.

Exhibit 26: an excerpt from the 2006 report on the abuse of Alfonso Pinex by Detectives McDermott and Anthony Maslanka, finding that there was sufficient evidence to seek their indictment for aggravated battery, perjury, and obstruction of justice. Report of the Special State's Attorney at 290, *In re* Appointment of Special Prosecutor, No. 2001-Misc-4 (Cir. Ct. Cook County, July 19, 2006) (2006 Report), available at http://www.aele.org/law/2006LROCT/chicagoreport.pdf [https://perma. cc/ZW5U-YNR8]. The report found credible Pinex's testimony that Maslanka struck him in the eye and McDermott hit him in the ribs and grabbed his legs so that he could not move. It also found credible his testimony that the detectives beat Pinex until he

defecated in his pants. Maslanka and McDermott also provided false testimony that Pinex did not tell them he had a lawyer or that he wanted his lawyer present. *Id.* at 288.

Exhibit 20: McDermott's immunized testimony at Burge's federal criminal trial in which he admitted that he was not truthful in testifying at Pinex's suppression hearing. He also admitted that he had struck Pinex in the chest and knocked him down before interrogating him. He admitted that he had not been truthful at the suppression hearing "because [Pinex] was a murderer, and [McDermott] didn't want him to get off."

Exhibit 23: In People v. Anderson, 90 CR 11984 (Cir. Ct. Cook County), Anderson testified that on April 18, 1990, he was taken into custody and taken to Area 2. McDermott refused his repeated requests for a telephone call and later asked Anderson about several armed robberies. When Anderson responded that he did not know about them, McDermott "put a gun to [his] head" and threatened to "blow [his] brains out." See *People v. Anderson*, 375 Ill. App. 3d 121, 127 (2007).

Exhibit 28: The Torture Inquiry and Relief Commission's (TIRC) disposition in the Anderson case, TIRC claim No. 2011.014-A, and attached database of abuse allegations against McDermott. *In re Claim of Anderson*, No. 2011.014-A (Ill. Torture & Relief Comm'n, May 20, 2013). The TIRC found Anderson's claims credible, meriting judicial review and appropriate relief. Although Detective Burge had been transferred to Area 3 at this point, while questioning Anderson, McDermott and Maslanka held a gun to Anderson's head and threatened to blow his brains out, and Maslanka jabbed Anderson with a night stick in his thighs and back. The TIRC also noted that McDermott had 13 other complaints of abuse against him of which it was aware.

Exhibit 27: McDermott's invocation of his fifth amendment right against self-incrimination before the Cook County special grand jury, convened by SSAs Egan and Boyle.

¶ 37 After defendant presented his evidence, the State submitted its offer of proof. The offer consisted of photographs of defendant taken at Area 2 on August 29-30, 1995, the Patterson trial testimony of medical technician Patricia Hayes, the Patterson trial testimony of ASA Quade, and the testimony of Area 2 Detective Frank Luera at the sentencing in the Ford case.

¶ 38 Hayes testified that she saw defendant on August 31, 1995, and she asked whether he needed any medical attention. She prepared a medical intake record for him. Defendant told her he was shot in the back three months ago, but he denied any past medical head injuries. He did not have any medical complaints. She took a photograph, which was introduced at trial.

¶ 39 ASA Quade testified that on August 30, 1995, she spoke with defendant and advised him of his *Miranda* rights. He told her that when Yucaitis brought him food, he saw Brunt and asked Yucaitis why Brunt was there. Yucaitis said that he could not speak with defendant because defendant asked for an attorney. Defendant said that he did not care about an attorney, and Yucaitis read him his rights. Defendant agreed to speak because he wanted to tell his side of the story and he wanted to talk about Brunt. He gave inculpatory statements as to the Patterson and Ford murders and other murders. ASA Quade took three separate handwritten statements, and after reviewing them, defendant signed the bottom of the pages. He told ASA Quade that he was treated well, especially by Hamilton. He was given food and drink, and no one made any threats or promises to him. Defendant was cooperative, talkative, and self-assured.

¶ 40    Detective Luera testified that on August 29, 1995, lineups were conducted in which defendant participated. From 7:30 a.m. to 9 a.m., a number of witnesses identified defendant from the lineup. Detective Luera then stated that, at 1 p.m., a witness identified defendant and, at 3:50 p.m., another witness identified defendant.

¶ 41    After closing arguments, the circuit court took the matter under advisement. In its September 21, 2018, ruling, the court stated that defendant "accurately framed the issue as would the result of the suppression hearing likely be different if the new evidence had been presented at the suppression hearing." The court also stated that it took "likely" to mean the "common law usage" of the word.

¶ 42    The court found that defendant established a pattern and practice "of certain individuals at Area Two: detectives, abuse, physical abuse and torture." Defendant further established "Detective McDermott and his complicity in the abuse conducted by the late John [*sic*] Burge, his active participation in some, at least one instance. And his assertion of Fifth Amendment with regard to another case." The court found that this evidence "would justify certainly calling his testimony into doubt." The court noted, however, that it had to look at McDermott's role under the particular facts of the case.

¶ 43    First, the court noted that there "was a great deal of notoriety about this case. At the time the news media referred to the defendant as the Chatham rapist before he was caught. Had his own name. So this was a heater case for the police." Also, the incidents of this case occurred two years after Burge was fired, and "no other detective involved in this pattern and practice was involved in this case." The only person in the pattern and practice evidence who was alleged to have beaten defendant was McDermott.

¶ 44    The court looked at defendant's stay at Area 2 and found that Hamilton stated he was the first to speak with defendant after his arrest. It was during this time that defendant made statements regarding the sexual assault cases. The detectives then left the room to pull reports and contact victims. Detective Hamilton did not return to defendant's room until 7 a.m., and he testified that no other detectives went into the room between the time he last spoke with defendant, until that time. The court noted that McDermott and Boylan spoke with defendant sometime between 9 a.m. and 11 a.m. but found credible their testimony that nothing happened because "Boylan corroborates McDermott there."

¶ 45    The court also found it "impossible" that, if defendant was beaten as badly as he said, "the next thing he's asking for is a lawyer. Beaten so bad, so I don't think—there's two things that corroborate McDermott right there that nothing happened." The court noted that defendant had "one small scratch on the side of his head which is readily explained by the taking down of the defendant at the time of his arrest by three individuals." The court continued:

    "I think it's important to recognize that in this case the police are not trying to get defendant to confess to a crime. They are trying to figure out what crime the defendant is confessing to.

    When he tells them about these things they are going, they are pulling files, looking through the files to see if they can match up what he's told. It's almost like defendant's claiming they were beating the statement out of him to make him confess to things they didn't realize he had committed, which is given the factual situation I think is, the notion is absurd frankly."

¶ 46    Before rendering its determination, the court again referred to the case as a "heater case." It pointed to the testimony of Yucaitis, who said he was told not to talk to defendant because they did not want to "screw up the case." Given the evidence the police "had on [defendant] at the time," the court believed they would not "want anything to mess it up" because "this is a heater case for the police." Furthermore, "by the testimony of Hamilton defendant already confessed to the rape case" and others "[p]rior to McDermott even seeing him." The court found that McDermott's testimony was corroborated by the facts and "by the other officers." Therefore, it denied defendant's postconviction petition for relief in all three cases. Defendant filed this appeal.

¶ 47                                    III. ANALYSIS

¶ 48    On appeal, defendant contends that the trial court erred in denying his request for postconviction relief. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a process in which a defendant can claim that his conviction was the result of a substantial denial of his rights under the United States Constitution or the Illinois Constitution or both. *People v. Cathey*, 2012 IL 111746, ¶ 17. The Act provides a three-stage process for non-death-penalty cases. *People v. Jones*, 213 Ill. 2d 498, 503 (2004). To survive summary dismissal at the first stage, defendant need only present the gist of a constitutional claim. *Id.* at 504. The circuit court may summarily dismiss a postconviction petition at this stage if it is frivolous or patently without merit. *Cathey*, 2012 IL 111746, ¶ 17. If the court does not dismiss the petition, it advances to the second stage where defendant may be appointed counsel. *People v. Tate*, 2012 IL 112214, ¶ 10. If at the second stage defendant makes a substantial showing of a constitutional violation, the petition advances to the third stage where the court conducts an evidentiary hearing. *Id.* The circuit court below denied defendant's petition for relief after a third-stage evidentiary hearing.

¶ 49    The circuit court acts as the finder of fact at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given their testimony. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. We generally defer to the circuit court as the finder of fact since it is in the best position to observe the conduct and demeanor of the parties and witnesses. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). When reviewing the court's determination after a third-stage evidentiary hearing, we will not reverse its decision unless it is manifestly erroneous. *Williams*, 2017 IL App (1st) 152021, ¶ 22. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *D.F.*, 201 Ill. 2d at 498-99.

¶ 50    At the evidentiary hearing conducted below, the circuit court's purpose was not to determine the ultimate issue of whether defendant's confession was coerced. *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80. Rather, the sole issue before the circuit court was whether the outcome of defendant's suppression hearing would have been different if the officers who denied using physical coercion had been subject to impeachment based on defendant's evidence showing a pattern and practice of police abuse. *Id.* Relevant to the court's determination are (1) whether any of the officers who interrogated defendant may have participated in systemic interrogation abuse at Area 2 and (2) whether those officers' credibility at the suppression hearing might have been impeached as a result. *People v. Patterson*, 192 Ill. 2d 93, 144-45 (2000).

¶ 51    The court below found that defendant's new evidence established a pattern and practice of certain individuals at Area 2 to engage in "physical abuse and torture" and that Detective McDermott was complicit in the abuse conducted by Burge. The court concluded that the evidence "would justify certainly calling his testimony into doubt." Nevertheless, it found McDermott's credibility unimpeached because his testimony was corroborated by the facts and by the testimony of other officers.

¶ 52    In finding the facts support McDermott's testimony that he did not physically abuse defendant, the circuit court relied on Detective Hamilton's testimony that he was the first to speak with defendant at Area 2. Hamilton also stated that, while he interviewed defendant off and on for a few hours, defendant made statements regarding several sexual assault cases. From this testimony, the court determined that defendant had made incriminating statements before McDermott ever saw him at the station. The court found defendant's claim that McDermott was "beating the statement out of him" absurd, because "in this case the police are not trying to get defendant to confess to a crime. They are trying to figure out what crime the defendant is confessing to." The court also found it "impossible" that defendant was beaten as badly as he claimed, noting that he had "one small scratch on the side of his head which is readily explained by the taking down of the defendant at the time of his arrest by three individuals."

¶ 53    The circuit court found the testimony of Hamilton and other detectives credible, in part, because there "was a great deal of notoriety about this case. At the time the news media referred to the defendant as the Chatham rapist before he was caught. Had his own name. So this was a heater case for the police." The court concluded that the police would not want the use of coercive tactics "to mess it up" since "this is a heater case for the police."

¶ 54    This finding, however, was not based on evidence presented at the suppression hearing. Yucaitis testified only that he was told not to talk to defendant because he had "invoked his rights and they didn't want to screw up the case." No one testified that police viewed defendant's case as a "heater case," nor did anyone testify that police would not engage in abusive tactics because it was a "heater case." Rather, the court relied on information outside the record regarding the "notoriety about this case" in finding the detectives' testimony credible. Judges are expected to make determinations based only upon the evidence presented. *People v. Steidl*, 177 Ill. 2d 239, 266 (1997). The court's consideration of information outside the record when determining witness credibility was error. *People v. Brantley*, 43 Ill. App. 3d 616, 618-20 (1976).

¶ 55    The court also gave significance to the fact that the suppression hearing took place two years after Burge was fired. It made this finding despite exhibit 28, which was a report finding that certain abuse claims against McDermott were credible even though Burge had transferred out of Area 2 when the torture allegedly occurred. The court further found that defendant never alleged anyone other than McDermott beat him, nor were any of the detectives who interrogated defendant named in the reports. However, it made no reference to exhibit 29, which showed that another detective involved in defendant's case, Yucaitis, was suspended for failing to stop an incident of torture and for failing to report Burge to commanding officers.

¶ 56    The fact that other officers may have stood by doing nothing, while McDermott committed acts of abuse, is relevant to the issue of McDermott's and the other detectives' credibility. *Whirl*, 2015 IL App (1st) 111483, ¶ 103. The circuit court did not consider whether other detectives may have displayed a "silent acceptance" of abusive tactics or whether McDermott's credibility was impaired as a result. See *id.* While we generally defer to the circuit court's

resolution of conflicts in the evidence and its determination on the credibility of witnesses, "the manifest weight standard is not a rubber stamp. It does not require mindless acceptance in the reviewing court." *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999). We must not "abdicate our responsibility to examine factual findings" and determine whether the court's finding was unreasonable, arbitrary, or not based on the evidence presented. *Id.*

¶ 57    Furthermore, defendant's new evidence was of such character that the outcome of the suppression hearing would likely have changed if McDermott's testimony, and the testimony of other officers, had been subject to impeachment. "Probability, not certainty, is the key" as the court effectively predicts the outcome of the suppression hearing, "considering all the evidence, both new and old, together." *People v. Coleman*, 2013 IL 113307, ¶ 97.

¶ 58    Defendant has consistently alleged that his confessions were coerced, and his allegations of coercion are comparable to the acts of coercion set forth in the new evidence. In his pretrial motion to suppress, defendant alleged that his statements were obtained as a result of interrogations that took place after he elected to remain silent and/or requested an attorney and that his statements were obtained as a result of physical coercion, specifically that Detectives Boyle and McDermott "hit the defendant with their fists in the stomach, and also about the head and neck. They also placed a gun to his head and mouth and hit him with a phone book." At the Patterson trial, defendant testified that, before he spoke with Detective Hamilton, McDermott grabbed defendant near the throat and pushed him against the wall. McDermott then punched defendant in the stomach and told defendant they would put him in the penitentiary forever. Defendant testified that, at another visit by McDermott, he grabbed defendant by the throat and pointed a gun at his head, telling him, "I am going kill [*sic*] you." He also forced the gun into defendant's mouth. McDermott, who had prior dealings with defendant, testified at the pretrial suppression hearing that defendant was an "evil" person who was "extremely dangerous."

¶ 59    Defendant's new evidence established that McDermott worked from Area 2 while Burge was commander there and that he also engaged in abusive practices. Both Detectives Hamilton and Yucaitis worked with McDermott and regularly apprised him of the progress of defendant's case. A report found that Yucaitis had known of incidents of torture by Burge but failed to report Burge to his commanding officer or anyone else. Defendant's allegations that McDermott hit him in the head, neck, and chest are similar to findings in another report that McDermott hit Alfonso Pinex in the ribs and chest, knocking him down before interrogating him. Defendant's claim that McDermott placed a gun to his head and mouth compares to the finding in the *Anderson* case that McDermott "put a gun to [Anderson's] head" and threatened to "blow [his] brains out." McDermott acknowledged that he did not testify truthfully at Pinex's suppression hearing because Pinex "was a murderer, and [he] didn't want him to get off." McDermott had a previous encounter with defendant that involved the shooting of a fellow officer, and he acknowledged that he viewed defendant as an "evil" person who was "extremely dangerous."

¶ 60    This new evidence was conclusive enough that the outcome of the suppression hearing likely would have been different if McDermott had been subject to impeachment based on the new evidence. See *Patterson*, 192 Ill. 2d at 144-45 (finding that new evidence of police torture was material and would likely change the result upon retrial where defendant consistently claimed he was tortured, his claims of torture were "strikingly similar to other claims" depicted in the new evidence, and the officers identified in the evidence were also involved in

defendant's case). Therefore, we find the circuit court's opposite conclusion manifestly erroneous and reverse the decision to deny defendant's petition for postconviction relief.

¶ 61 Due to our resolution of this appeal, we need not consider the issue raised in defendant's supplemental brief of whether the circuit court deprived defendant of a fair evidentiary hearing when it considered excluded trial testimony in violation of its ruling on the motion *in limine*.

¶ 62 Defendant requests that, if his case is remanded for a new suppression hearing, this court assign the matter to a different judge. The circuit judge below presided over all three of defendant's trials as well as his prior suppression hearing and from its rulings has expressed a tendency to affirm the officers' credibility while giving little weight to defendant's new evidence. This court has the authority to reassign a matter to a new judge on remand. *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45. We agree that the interests of justice would be best served if the case were assigned to another judge on remand.

¶ 63                                          IV. CONCLUSION

¶ 64 For the foregoing reasons, we reverse the circuit court's dismissal of defendant's petition after an evidentiary hearing and remand for a new suppression hearing.

¶ 65 Reversed and remanded with directions.