2023 IL App (1st) 221033

FIRST DISTRICT
FIFTH DIVISION
November 3, 2023

Nos. 1-22-1033, 1-22-1034, & 1-22-1035 Consolidated

|  |  |  |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | Nos. 95 CR 27596 |
| v. | ) | 95 CR 27598 |
| | ) | 95 CR 27600 |
| RALPH HARRIS, | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Michael Clancy, |
| | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court, with opinion.
Justice Mikva concurred in the judgment and opinion.
Presiding Justice Mitchell dissented, with opinion.

**OPINION**

¶ 1   Defendant Ralph Harris was found guilty in three separate cases of the August 17, 1992,

murder and attempted armed robbery of David Ford (No. 95-CR-27596) (the Ford case), the

August 17, 1992, murder and attempted robbery of Wiliam Patterson and the attempted murder of

James Patterson (No. 95-CR-27598) (the Patterson case), and the July 18, 1995, aggravated

criminal sexual assault and armed robbery of R.T. (No. 95-CR-27600) (the R.T. case). After this

court upheld those convictions on appeal, Mr. Harris filed a petition pursuant to the Post-

Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), alleging, *inter alia*, that

his pretrial inculpatory statements were the product of police coercion. He sought a new

suppression hearing and new trials where he could introduce evidence of the "pattern and practice"

of abuse and torture at the Area 2 Chicago Police Department, where he was held following his

arrest. The circuit court denied Mr. Harris's petition after a third-stage evidentiary hearing, and Mr. Harris appealed. This court reversed the circuit court's ruling and remanded the matter for a new suppression hearing. *People v. Harris*, 2021 IL App (1st) 182172.

¶ 2       On remand, the trial court conducted a new suppression hearing where it heard testimony from the officers involved in Mr. Harris's arrest and interrogation, and Mr. Harris presented evidence of the pattern and practice of physical abuse committed by Area 2 police detectives during the time of his arrest. Following the hearing, the circuit court denied the motion to suppress Mr. Harris's custodial statements. The court, however, granted Mr. Harris new trials finding that he and his defense counsel were prejudiced by the lack of information about the complaints of physical abuse and misconduct committed by the detectives involved in Mr. Harris's cases. The State now appeals.

¶ 3       On appeal, the State contends that the circuit court erred in granting Mr. Harris new trials where the circuit court exceeded its limited jurisdiction on remand, improperly granted Mr. Harris relief based on an abandoned postconviction claim, improperly granted a new trial despite denying the motion to suppress, and failed to consider whether the proffered newly discovered evidence was of such a conclusive character that it was likely to change the result on retrial. For the reasons that follow, we dismiss the appeal for lack of jurisdiction.

¶ 4                                              I. BACKGROUND

¶ 5       This court has previously detailed the facts giving rise to Mr. Harris's convictions in his direct appeals. See *People v. Harris*, 358 Ill. App. 3d 1180 (2005) (table) (unpublished order under Illinois Supreme Court Rule 23) (the Ford case and the Patterson case); *People v. Harris*, 402 Ill. App. 3d 1186 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23) (the R.T.

case). We have also discussed Mr. Harris's postconviction petition and the evidence presented at the third stage evidentiary hearing in his previous appeal. See *Harris*, 2021 IL App (1st) 182172. Therefore, we will only discuss those facts relevant to our disposition in this case.

¶ 6     Mr. Harris was arrested in August 1995 pursuant to a warrant and was investigated in connection with an aggravated criminal sexual assault. During the investigation, officers connected Mr. Harris to previously unsolved murders that took place in 1992. Mr. Harris eventually went to trial in the three separate cases noted above.

¶ 7     In June 1998, Mr. Harris filed an omnibus motion to suppress his confessions in his three cases. In his amended motion, Mr. Harris contended, *inter alia*, that his statements were obtained as a result of physical coercion by the interrogating detectives. The trial court denied the motion to suppress after hearing testimony from the detectives. The court found Mr. Harris guilty in all three cases, and those convictions were affirmed on direct appeal.

¶ 8     Mr. Harris subsequently filed postconviction petitions asserting that newly discovered evidence corroborated his claims that his confessions were obtained through police coercion and abuse. The circuit court advanced Mr. Harris's petitions to the third stage of postconviction proceedings, where it held a combined evidentiary hearing on the claims of a coerced confession.

¶ 9     At the evidentiary hearing, Mr. Harris presented his testimony from the Patterson case, where he described the circumstances surrounding his arrest and interrogation and the police misconduct and violence that he alleged occurred. Mr. Harris also presented numerous exhibits that he alleged constituted new evidence to support his claim of the decades-long pattern of physical abuse and torture committed by the Area 2 detectives under Jon Burge. In response, the State presented photographs taken of Mr. Harris after his arrest, as well as the testimony of a

medical technician who examined Mr. Harris after his arrest, the trial testimony of the assistant state's attorney (ASA) who took Mr. Harris's statement in the Patterson case, and the testimony of the Area 2 detective who conducted Mr. Harris's lineup in the Ford case. The circuit court denied Mr. Harris relief on each of his petitions, finding that the evidence supported the testimony of the detectives that Mr. Harris was not beaten or coerced and gave his statements voluntarily.

¶ 10     On appeal, this court reversed the circuit court's denial of the petition finding that its ruling was not based on the evidence presented. *Harris*, 2021 IL App (1st) 182172, ¶ 54. This court also found that the circuit court erred in relying on evidence outside of the record when it found that this case was a " 'heater case' " for support for its determination that the detectives would not want to " 'screw up the case.' " *Id.* This court further found that the circuit court ignored credible evidence that former Chicago police Detective Michael McDermott, who was involved in Mr. Harris's arrest and interrogation, was allegedly involved in torture and abuse even after Burge was fired. *Id.* ¶ 55. This court determined that the new evidence Mr. Harris presented was "of such character that the outcome of the suppression hearing would likely have changed if McDermott's testimony, and the testimony of other officers, had been subject to impeachment." *Id.* ¶ 57. This court concluded that the circuit's court ruling in denying the petitions was manifestly erroneous, and we remanded for a new suppression hearing. *Id.* ¶¶ 60, 64. This court also assigned the case to a different circuit court judge finding the circuit court judge below "ha[d] expressed a tendency to affirm the officers' credibility while giving little weight to defendant's new evidence." *Id.* ¶ 62.

¶ 11     On remand, the circuit court recognized that: "These matters are before the Court to conduct a new suppression hearing that's based on the Appellate Court granting the request for

postconviction relief of the defendant/petitioner asking for a new suppression hearing. So we're here for a new suppression hearing."

¶ 12    At the suppression hearing, former Area 2 Detective James Boylan testified that he and his partner, Detective McDermott, arrested Mr. Harris pursuant to a warrant on August 29, 1995. Officers approached Mr. Harris with guns drawn and tackled him to the ground, but Detective Boylan did not see any of the officers hold a gun to Mr. Harris's head. While Mr. Harris was in custody, Detective Boylan executed a search warrant at Mr. Harris's address along with several other officers. The officers recovered .380 cartridges and holsters and pages of a catalog regarding .380 handguns. When Detective Boylan returned to the police station, he assisted in conducting lineups for the investigation. Detective Boylan denied abusing or threatening Mr. Harris and denied seeing any other officers abuse or threaten him.

¶ 13    Former Area 2 Detective John Hamilton testified that he was one of the officers who aided in the arrest of Mr. Harris in August 1995. Detective Hamilton testified that the officers entered the apartment with their guns drawn because they believed Mr. Harris was armed. After a struggle, Detective Hamilton wrestled Mr. Harris to the ground. Detective Hamilton noted that there was a gun pointed at Mr. Harris's left temple that left "scratches" near that area. Detective Hamilton did not hear any of the other officers threaten Mr. Harris during the arrest. Detective Hamilton participated in the interrogation of Mr. Harris at the police station and also helped execute the search warrant at his home.

¶ 14    At the police station, Mr. Harris agreed to speak with Detective Hamilton and acknowledged that he committed murders in 1992. Detective Hamilton took handwritten notes about what Mr. Harris told him about the murders and both Detective Hamilton and Mr. Harris

signed the notes. After taking the information from Mr. Harris, Detective Hamilton spoke to ASA Leslie Quade, who took additional statements from Mr. Harris about the murders. Before taking the statements, ASA Quade advised Mr. Harris of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and Mr. Harris acknowledged that while he was at the Area 2 police station, he had been provided with food, drinks, and cigarettes. Detective Hamilton denied ever threatening or abusing Mr. Harris and denied seeing anyone else threaten or abuse him. Detective Hamilton noted that Mr. Harris refused to speak with Detectives Boylan and McDermott.

¶ 15    The correctional medic at Cermak Health Services who conducted Mr. Harris's intake screening in August 1995 noted that, at the time of the screening, Mr. Harris did not have any physical injuries.

¶ 16    Former Area 2 Detective Linda Drozdek testified that she prepared a series of lineups at the Area 2 police station that included Mr. Harris. Detective Drozdek testified that during those lineups she did not observe any injuries to Mr. Harris and he did not complain of any injuries or mistreatment.

¶ 17    Angela Alexander[1] testified that she was with Mr. Harris at her apartment at the time of his arrest in August 1995. When police arrived and knocked on the apartment door, Mr. Harris told her to not open the door because he did not want to go "back to jail." When the officers entered the apartment, Ms. Alexander was thrown to the floor and one of the officers pinned her down. Ms. Alexander was face down on the floor, so she could not see anything, but she heard the officers say, "[s]how us your hands," and she felt a gun being pressed into the back of her head. When she

---

[1]Angela Alexander was Angela Clark at the time of Mr. Harris's arrest.

was allowed up off the floor, she observed Mr. Harris sitting on the kitchen floor in handcuffs. Ms. Alexander did not hear any of the officers threaten Mr. Harris during the arrest.

¶ 18    Ms. Alexander was taken to the Area 2 police station, where she was interviewed by detectives. She testified that none of the officers harmed or threatened her while she was at the police station. After Ms. Alexander spoke to the detectives, she was permitted to leave the police station. A few days later, Ms. Alexander spoke to Mr. Harris on the phone. During the conversation, he never told her that the police had mistreated or threatened him. Ms. Alexander saw Mr. Harris in person a couple weeks later, and he likewise did not raise any complaints about his treatment from the officers.

¶ 19    ASA Thomas Darman testified that he took a statement from Mr. Harris following his arrest. ASA Darman asked Mr. Harris how he had been treated at the police station, and Mr. Harris responded that he had been treated "fine" and did not have any complaints. Mr. Harris did not complain of any injuries and was "conversational." Mr. Harris's statements about how he had been treated were memorialized in his handwritten statement to ASA Darman:

> "Harris states that he has been treated well by Assistant State's Attorney Thomas Darman, as well as by the Chicago Police. Harris states that he has been given pizza, bologna sandwiches to eat, several sodas to drink, and as many cigarettes as he wanted to smoke, and was allowed to use the bathroom whenever he wished.
>
> Harris states that no threats or promises have been given to him in return for this statement, and that he is giving this statement freely and voluntarily."

¶ 20    ASA Quade also took a statement from Mr. Harris at the Area 2 police station. When she first arrived at the police station, Mr. Harris stated that he wanted to speak to an attorney, and ASA

Quade left the interview room. Mr. Harris later reinitiated contact with the detectives and agreed to speak to ASA Quade without an attorney present. Outside the presence of the detectives, ASA Quade asked Mr. Harris how he had been treated at the police station. Mr. Harris stated that he had been treated "well" and had been treated "especially" well by Detective Hamilton. ASA Quade confirmed that Mr. Harris had eaten and had been permitted to smoke cigarettes. Mr. Harris gave inculpatory handwritten statements to both ASA Darman and ASA Quade.

¶ 21    The court also admitted the prior testimony of Detective John Yucatis, who was deceased at the time of the suppression hearing. Detective Yucatis had previously testified at the original hearing on Mr. Harris's motion to suppress and had testified at Mr. Harris's trials. That testimony is recounted in Mr. Harris previous appeals. See *Harris*, 358 Ill. App. 3d 1180. Detective Yucatis testified consistently with the other Area 2 detectives and the ASAs regarding Mr. Harris's treatment at the police station.

¶ 22    Mr. Harris called Dr. Steven Miles, an expert in the area of "torture, particularly in the area of medical observation and evaluation." Dr. Miles testified that while Mr. Harris was at the Area 2 police station, he "possibly" suffered physical abuse or coercive treatment with the goal of securing his signature on legal documents. Dr. Miles testified that Mr. Harris was also subjected to sleep deprivation and stress and may have been subjected to "stealth torture," which includes physical abuse that does not leave a mark. Dr. Miles observed a photograph of Mr. Harris that depicted an abrasion on the left side of Mr. Harris's head that was taken near the time of his arrest. Dr. Miles testified that the injury depicted in the photograph was not consistent with a gun being held to the side of Mr. Harris's head during his arrest.

¶ 23    In order to support his contentions of a pattern and practice of torture at Area 2, Mr. Harris also presented testimony from two arrestees who had been interrogated and subject to physical and psychological torture at the Area 2 police station: Anthony Holmes and Joseph Carroll.

¶ 24    Mr. Harris did not testify at the hearing, but his testimony from the Patterson case was admitted into evidence as an exhibit.[2] Mr. Harris also offered numerous exhibits that he contended established a pattern of practice of torture and abuse by Burge and other detectives at Area 2.

¶ 25    In an oral ruling, the court found that the State had established the voluntariness of Mr. Harris's confession by a preponderance of the evidence and that Mr. Harris was not "physically, psychologically or mentally coerced into making statements." The court observed that there was testimony regarding the abrasion on the left side of Mr. Harris's face, but Mr. Harris never established that the injury occurred while he was in police custody. The court noted that the arrest was "physical" in that multiple officers entered the apartment with guns drawn and Detective Hamilton tackled Mr. Harris to the ground. The court believed that the injury could have happened during the arrest but determined that the injury was "insignificant" and was not inflicted as a means of obtaining a confession. Finally, the court found that Mr. Harris was properly questioned by detectives after he invoked his right to counsel when he reinitiated contact with the detectives. The court therefore denied the motion to suppress.

¶ 26    The court determined, however, that a new trial was warranted because the defense was "significantly and unfairly prejudiced by the lack of information and knowledge of past misconduct attributed to a number of the detectives involved in the interrogation of Mr. Harris."

---

[2]This testimony is detailed in this court's order on Mr. Harris's direct appeal in the Patterson case. See *Harris*, 358 Ill. App. 3d 1180.

The court found that the complaints of abuse were unknown to Mr. Harris and his defense counsels at his trials and the evidence would have allowed the triers of fact to consider his custodial statements in a different light. The State now appeals.

¶ 27                                        II. ANALYSIS

¶ 28    On appeal, the State contends that the circuit court erred in granting Mr. Harris new trials where the court exceeded its limited authority on remand by vacating Mr. Harris's convictions and ordering the new trials. The State also contends that the court erred in ordering new trials where it denied the motion to suppress because this remedy was not "legally available" and was never addressed by the parties. The State maintains that the court also erred in considering Mr. Harris's claims regarding the effect of the newly discovered evidence concerning Area 2 because that claim was abandoned prior to the third stage evidentiary hearing, and the court failed to properly apply the test for newly discovered evidence to determine whether the evidence was of such a conclusive character that it would probably change the result on retrial.

¶ 29                                        A. Jurisdiction

¶ 30    Before we may address the merits of the State's appeal, we must first address our jurisdiction. Mr. Harris filed a motion to dismiss this appeal for lack of appellate jurisdiction and we ordered the motion taken with the case. In his motion to dismiss, Mr. Harris contends that the instant appeal is an "unauthorized interlocutory appeal by the State." Mr. Harris points out that under Illinois Supreme Court Rule 604(a) (eff. July 1, 2017), the State may appeal from interlocutory orders of the circuit court only in certain circumstances not present here. Under that rule, the State may appeal,

"only from an order or judgment the substantive effect of which results in dismissing a charge for any of the grounds enumerated in section 114-1 of the Code of Criminal Procedure of 1963; arresting judgment because of a defective indictment, information or complaint; quashing an arrest or search warrant; or suppressing evidence." Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017).

Mr. Harris maintains that the trial court's grant of a new trial does not fall under any of the circumstances enumerated in the Rule and the State did not seek leave of court to file the instant appeal. Mr. Harris asserts that we should therefore dismiss this appeal.

¶ 31     In response, the State contends that the instant appeal is not an interlocutory appeal but was an appeal from a final order by the trial court granting a new trial as a result of proceedings on Mr. Harris's petition for postconviction relief. The State asserts that the hearing on the motion to suppress was a continuation of the postconviction proceedings following this court's remand and was not the beginning of a new criminal proceeding. Citing the supreme court's ruling in *People v. Joyce*, 1 Ill. 2d 225 (1953), the State maintains that it may appeal the grant of a new trial pursuant to the Act and therefore Rule 604(a) had no applicability here.

¶ 32     Mr. Harris filed a reply to the State and also addressed the matter in his appellee brief. Mr. Harris maintains that when this court reversed the circuit court's denial of his petition in the prior appeal and remanded the matter for a new suppression hearing, this court granted the relief he sought and "disposed" of the postconviction proceeding. Mr. Harris contends that the suppression hearing was therefore not a continuation of the postconviction proceeding, as the State maintains, but was instead part of his underlying criminal cases. In support of that argument, Mr. Harris points out that at the suppression hearing, the court noted that the State bore the burden of proving that

Mr. Harris's custodial statements were voluntary, while under the Act, the defendant bears the burden of establishing a violation of his constitutional rights. Mr. Harris concludes that the State's appeal from the circuit court's order of a new trial was therefore an impermissible interlocutory appeal.

¶ 33    In our prior decision, we reversed the circuit court's order denying Mr. Harris's petition for postconviction relief at the third stage of proceedings and remanded for a new suppression hearing. *Harris*, 2021 IL App (1st) 182172, ¶ 64. In his amended petition, Mr. Harris asked the court to "vacate his conviction and sentence and remand this case for leave to pursue a motion to suppress his confession as involuntary, or in the alternative to hold evidentiary hearings on his petition as necessary to resolve any disputed issues of fact and that it vacate his conviction and sentence and remand the case for a new trial." By denying his petition after conducting a third stage evidentiary hearing, the circuit court denied the relief Mr. Harris sought in his petition. However, when this court reversed that decision, it was implicitly *granting* the relief sought in the petition. That is, it was vacating Mr. Harris's conviction and sentence and remanding the case for leave to pursue the motion to suppress and new trials.

¶ 34    The State's position that the new suppression hearing was somehow a continuation of the postconviction proceedings has no basis in the procedures under the Act. The Act provides for a three-stage mechanism in proceedings that do not involve the death penalty.[3] *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). After the third stage evidentiary hearing, the petition is either denied, and the defendant receives no relief, or the petition is granted the circuit court has discretion as to the

---

[3]Mr. Harris was originally sentenced to death in the Patterson case and the Ford case, but his death sentences were commuted by the Illinois governor.

relief awarded. *People v. Davis*, 369 Ill. App. 3d 384, 389-90 (2006). This court, in reversing the circuit court's denial, could have remanded the matter to the circuit court to determine the appropriate relief. *Id.* at 393-94. However, it was clear from the evidence presented at the third stage evidentiary hearing that the appropriate relief in this case was to vacate Mr. Harris's convictions and sentences and to remand for a new suppression hearing. Such an action was within our authority on review. *Id.* at 394; see also *People v. Stanley*, 266 Ill. App. 3d 307, 312 (1994) (reversing the circuit court's denial of the defendant's postconviction petition following a third stage evidentiary hearing, vacating the defendant's conviction, and remanding for a new trial).

¶ 35    The State's position that the new suppression hearing was a continuation of the postconviction proceedings is also belied by the record. It is axiomatic that once a postconviction proceeding has advanced past the first stage, "the defendant bears the burden of making a substantial showing of a constitutional violation." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (citing *People v. Coleman*, 206 Ill. 2d 261, 277 (2002)). Here, however, in conducting the new suppression hearing, the circuit court repeatedly recognized that the State bore the burden of establishing the voluntariness of Mr. Harris's statements. See *People v. Slater*, 228 Ill. 2d 137, 149 (2008) ("Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence."). The State did not dispute this characterization of its burden before the circuit court. Thus, it was clear that the parties and the circuit court understood that Mr. Harris had satisfied his burden under the Act of making a substantial showing of a constitutional violation, the postconviction proceedings had concluded, and a new criminal proceeding, where the State bore the burden of proof, had begun.

¶ 36    We find this court's decision in *People v. Almendarez*, 2022 IL App (1st) 210029-U (*Almendarez II*), illustrative. In that case, as here, this court in two separate prior appeals reversed the circuit's denial of the defendants' postconviction petitions following third stage evidentiary hearings and remanded for new suppression hearings. *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 79; *People v. Almendarez*, 2020 IL App (1st) 170028-U, ¶ 78 (*Almendarez I*). On remand, the trial court denied both defendants' motions to suppress after a hearing and then took the matter " 'off call.' " *Almendarez II*, 2022 IL App (1st) 210029-U, ¶ 16. The defendants appealed, arguing that the court erred in denying their motions to suppress. *Id.* ¶ 18.

¶ 37    In finding that we lacked jurisdiction to consider the merits of the appeal, this court stated that when it reversed the circuit court's orders denying the defendants' third stage postconviction petitions, "it logically followed that this court was vacating their convictions, as well as remanding for a new suppression hearing and trial, even[ ] though that relief was not explicitly stated." *Id.* ¶ 21. The court stated that it intended for a new trial to take place regardless of whether the trial court granted or denied the motions to suppress and thus the court taking the matter " 'off call' " after denying the motions was not a final and appealable order. *Id.*

¶ 38    The State attempts to distinguish *Almendarez II*, arguing that in the previous appeals involved in that case, this court stated that it was remanding for a new suppression hearing "and, if necessary, a new trial." *Galvan*, 2019 IL App (1st) 170150, ¶ 79; *Almendarez I*, 2020 IL App (1st) 170028, ¶ 78. The State points out that in our order remanding this matter for a new suppression hearing, we did not include the same "if necessary, a new trial" language indicating that no new trial was contemplated if the circuit court denied the motion to suppress. However, we find this discrepancy immaterial to our resolution here. This court explained in *Almendarez II* that

its use of the phrase "if necessary, a new trial" was "intended to reflect that if the circuit court granted the motions to suppress, the State might abandon the prosecution for lack of admissible evidence. This court did not intend that if the circuit court denied the motions to suppress, that no new trial should take place." *Almendarez II*, 2022 IL App (1st) 210029-U, ¶ 21.

¶ 39     Here, too, by remanding the matter for a new suppression hearing, this court intended that Mr. Harris's convictions would be vacated regardless of the outcome of the suppression hearing. If the motion to suppress were granted, the State could then determine whether to pursue the prosecution in the absence of that evidence. If, however, the motion was denied, a new trial was still required. Thus, the circuit court's order granting a new trial was not necessary as a new trial was already contemplated by this court's order in *Harris*, 2021 IL App (1st) 182172. Even so, the order granting the new trial was not a final order and was not one of the interlocutory orders the State may appeal pursuant to Rule 604(a). See *People v. Allen*, 168 Ill. App. 3d 397, 402 (1987) ("It is true, as defendant contends, that an order by a circuit court granting a defendant a new trial in a criminal case is not one of the grounds enumerated by Supreme Court Rule 604(a) [citation] from which the State is authorized to appeal.").

¶ 40     Therefore, with the clarification that this court's previous order in *Harris*, 2021 IL App (1st) 182172, vacated Mr. Harris's convictions, necessitating a new trial, we dismiss this appeal for lack of jurisdiction.

¶ 41                                III. CONCLUSION

¶ 42     For the reasons stated, we dismiss this appeal for lack of jurisdiction.

¶ 43     Appeal dismissed.

¶ 44     PRESIDING JUSTICE MITCHELL, dissenting:

¶ 45     Harris argues that in a prior published opinion issued in March 2021, this court vacated his convictions, remanded for a suppression hearing, and remanded for a new trial. *People v. Harris*, 2021 IL App (1st) 182172. As such, he reasons that our prior opinion disposed of his postconviction petition and that the State's attempt to appeal the circuit court's grant of a new trial is an improper interlocutory appeal. Not so. The proceedings on remand were a continuation of Harris's efforts at postconviction relief, and the State may properly appeal the grant of postconviction relief. See *People v. Joyce*, 1 Ill. 2d 225, 227 (1953) ("The judgment below, while it does not ultimately dispose of the criminal proceedings against the defendant, is clearly a final disposition of his petition under the act.").

¶ 46     There is *no* indication in our 2021 opinion that we ever vacated Harris's convictions or ordered a new trial. The focus of that prior opinion was on the necessity of a new suppression hearing. There was no discussion of vacating convictions or granting a new trial. Our disposition expressly provided that "we reverse the circuit court's dismissal of defendant's petition after an evidentiary hearing and *remand for a new suppression hearing*." (Emphasis added.) *Harris*, 2021 IL App (1st) 182172, ¶ 64. Our mandate reads, "Reversed and remanded with directions." *Id*. ¶ 65. Again, there is no mention of a new trial or vacating convictions.

¶ 47     This construction finds support not only in the text of the opinion but also in the relief that Harris sought in that appeal. His statement of the issues focused on the suppression hearing, and he framed his chief issue on appeal as follows:

        "Did Petitioner Ralph Harris meet his burden to establish by a preponderance of
        evidence that when the testimony presented by the State at his pretrial suppression hearing

is weighed against the newly discovered evidence of the pattern and practice of torture and physical abuse at Area 2 Police Headquarters and evidence of the involvement in that pattern and practice by Detective Michael McDermott, the outcome of his suppression hearing would likely have been different?"

Further, the only relief Harris sought in his brief was a new suppression hearing:

"A new suppression hearing is warranted in Petitioner Harris' cases ***. *** For all of the foregoing reasons, Petitioner-Appellant Ralph Harris respectfully requests that this Court reverse the trial court's ruling denying post-conviction relief, and remand this matter for a new suppression hearing before a different judge."

And he echoed that request for a new suppression hearing in his reply brief:

"Petitioner-Appellant Ralph Harris respectfully requests that this Court reverse the trial court's denial of post-conviction relief and remand this matter to a different judge for a new suppression hearing, or in the alternative, for a new post-conviction evidentiary hearing."

¶ 48     It is axiomatic that an appellate opinion is a binding and conclusive adjudication only as to those specific matters discussed by the appellate court. *Cf. Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390 (2001). The suggestion that a reviewing court would undertake to vacate criminal convictions and order a new trial entirely *sub silentio* finds no precedent in our cases. And with good reason. Such a process is manifestly unfair to the State because it prevents an intelligent decision on when to seek leave to appeal. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 49    For all these reasons, I believe that the proceedings on remand were a continued adjudication of Harris's postconviction petition and that we have jurisdiction to entertain the State's appeal on the merits.

---

*People v. Harris*, 2023 IL App (1st) 221033

---

| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 95-CR-27596, 95-CR-27598, 95-CR-27600; the Hon. Michael Clancy, Judge, presiding. |
|---|---|

---

| **Attorneys for Appellant:** | Robert J. Milan, Special State's Attorney, of Chicago (Myles P. O'Rourke, Assistant Special State's Attorneys, of counsel), and Alan J. Spellberg, Assistant Special State's Attorney, of Highland Park, for the People. |
|---|---|

---

| **Attorneys for Appellee:** | Leonid Feller, of Quinn Emanuel Urquhart & Sullivan, of Chicago, for appellee. |
|---|---|

---