2025 IL App (1st) 1221033-U

Nos. 1-22-1033, 1-22-1034, & 1-22-1035 cons.

Order filed October 9, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | Nos. 95 CR 27596 |
| v. | ) | 95 CR 27598 |
| | ) | 95 CR 27600 |
| RALPH HARRIS, | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Michael Clancy, |
| | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We vacate in part and affirm in part the circuit court's order vacating defendant's convictions and ordering new trials where the court exceeded its jurisdiction on remand and did not err in denying the motion to suppress. We reinstate defendant's convictions and sentences.

¶ 2     Defendant Ralph Harris was found guilty in three separate cases of the August 17, 1992, murder and attempted armed robbery of David Ford (No. 95-CR-27596) (the Ford case), the August 17, 1992, murder and attempted robbery of Wiliam Patterson and the attempted murder of

James Patterson (No. 95-CR-27598) (the Patterson case), and the July 18, 1995, aggravated criminal sexual assault and armed robbery of R.T. (No. 95-CR-27600) (the R.T. case). After this court upheld those convictions on direct appeal, Mr. Harris filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), alleging, *inter alia*, that his pretrial inculpatory statements were the product of police coercion. He sought a new suppression hearing and new trials where he could introduce evidence of the "pattern and practice" of abuse and torture at the Area 2 Chicago Police Department, where he was held and interrogated following his arrest. The circuit court denied Mr. Harris's petition after a third-stage evidentiary hearing under the Act, and Mr. Harris appealed. This court reversed the circuit court's ruling and remanded the matter for a new suppression hearing. *People v. Harris*, 2021 IL App (1st) 182172 (*Harris I*).

¶ 3       On remand, the circuit court conducted a new suppression hearing where it heard testimony from the officers involved in Mr. Harris's arrest and interrogation, and Mr. Harris presented evidence of the pattern and practice of physical abuse committed by Area 2 police detectives during the time of his arrest. Following the hearing, the circuit court denied the motion to suppress Mr. Harris's custodial statements. The court, however, vacated Mr. Harris's convictions and granted him new trials, finding that he and his defense counsel were prejudiced by the lack of information about the complaints of physical abuse and misconduct committed by the detectives involved in Mr. Harris's cases.

¶ 4       The State appealed and this court dismissed the appeal for lack of jurisdiction, finding that the court in *Harris I* vacated Mr. Harris's convictions when it remanded for a new suppression hearing. *People v. Harris*, 2023 IL App (1st) 221033. The supreme court allowed the State's petition for leave to appeal from that opinion (Ill. S. Ct. R. 315(a) (eff. Dec. 7, 2023). The supreme

court found that this court erred in holding that we lacked jurisdiction to consider the merits of the State's appeal, and remanded the cause to this court for consideration of the State's appeal. *People v. Harris*, 2025 IL 130351, ¶¶ 54, 56. The supreme court expressed no opinion on the propriety of the circuit court's order or the merits of the State's contentions on appeal. *Id.* ¶ 54. On remand, we granted the State's motion for supplemental briefing.

¶ 5      In its original briefs and its supplemental briefs, the State contends that the circuit court erred in granting Mr. Harris new trials after denying his motion to suppress where the circuit court exceeded its limited jurisdiction on remand from *Harris I*, improperly granted Mr. Harris relief based on an abandoned postconviction claim of ineffective assistance of counsel based on counsel's failure to present evidence of police abuse and misconduct at Area 2 in Mr. Harris's murder trials, improperly granted new trials despite denying the motion to suppress, and failed to consider whether the proffered newly discovered evidence was of such a conclusive character that it was likely to change the result on retrial. For the reasons that follow, we vacate the order of the circuit court vacating Mr. Harris's convictions and ordering new trials and we reinstate Mr. Harris's convictions.

¶ 6                                  I. BACKGROUND

¶ 7      This court has previously detailed the facts giving rise to Mr. Harris's convictions in his direct appeals. See *People v. Harris*, 358 Ill. App. 3d 1180 (2005) (table) (unpublished order under Illinois Supreme Court Rule 23) (the Ford case and the Patterson case); *People v. Harris*, 402 Ill. App. 3d 1186 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23) (the R.T. case). We have also discussed Mr. Harris's postconviction petition and the evidence presented at the third stage evidentiary hearing in his previous appeal. See *Harris I*, 2021 IL App (1st) 182172. Therefore, we will discuss only those facts relevant to our disposition in this case.

¶ 8     Mr. Harris was arrested in August 1995 pursuant to a warrant and was investigated in connection with an aggravated criminal sexual assault. During the investigation, officers connected Mr. Harris to previously unsolved murders that took place in 1992. Mr. Harris made inculpatory statements to detectives regarding the aggravated criminal sexual assault and the murders. Mr. Harris eventually went to trial in the three separate cases noted above.

¶ 9     In June 1998, Mr. Harris filed an omnibus motion to suppress his confessions in his three cases. In his amended motion, Mr. Harris contended, *inter alia*, that his statements were obtained as a result of physical and mental coercion by the interrogating detectives. Specifically, he alleged that Detectives Michael McDermott and James Boylan struck him with their fists, pointed a gun at his head, placed a gun in his mouth, and hit him with a phonebook. He further alleged that Detective John Yucaitis told him that he would arrest and charge his girlfriend and have her children placed in the custody of the Department of Children and Family Services. At the hearing, the State presented testimony from the three detectives. Mr. Harris did not testify, but presented the testimony of his girlfriend and Patrick Blunt, who was in a lineup with him at the police station. The circuit court denied the motion to suppress, finding that Mr. Harris's statements were made freely and voluntarily. The court found Mr. Harris guilty in all three cases, and those convictions were affirmed on direct appeal.

¶ 10     Mr. Harris subsequently filed postconviction petitions in all three of his cases, asserting that newly discovered evidence corroborated his claims that his confessions were obtained through police coercion and abuse in violation of the fifth amendment. U.S. Const., amend V. He asserted that his convictions should be overturned because the police used coercion to elicit involuntary confessions that were used to convict him. He further contended that newly discovered evidence of a pattern and practice of police torture by detectives at the Area 2 police department

corroborated his claims that his confessions were obtained through coercion and should have been suppressed. He also alleged that his trial counsel was ineffective for failing to investigate and introduce evidence of Detective McDermott's history of coercion. The circuit court advanced Mr. Harris's petitions to the third stage of postconviction proceedings, where it held a combined evidentiary hearing on the claims of a coerced confession and ineffective assistance of counsel.

¶ 11    At the evidentiary hearing, Mr. Harris presented his testimony from the Patterson case, where he described the circumstances surrounding his arrest and interrogation and the police misconduct and violence that he alleged occurred. Mr. Harris also presented numerous exhibits that he alleged constituted new evidence to support his claim of the decades-long pattern of physical abuse and torture committed by the Area 2 detectives under Jon Burge. Postconviction counsel argued that the purpose of the evidentiary hearing was to determine whether there should be a new suppression hearing based on the new exhibits but did not mention the claim of ineffective assistance of counsel and offered no evidence in support of that claim.

¶ 12    In response, the State presented photographs taken of Mr. Harris after his arrest, as well as the testimony of a medical technician who examined Mr. Harris after his arrest, the trial testimony of the assistant state's attorney (ASA) who took Mr. Harris's statement in the Patterson case, and the testimony of the Area 2 detective who conducted Mr. Harris's lineup in the Ford case. The circuit court denied Mr. Harris relief on each of his petitions. The court found that Detective McDermott's involvement in the abuse carried out at Area 2 called into question his testimony at the suppression hearing but determined that the other evidence presented regarding Mr. Harris's confessions supported the testimony of the detectives that Mr. Harris was not beaten or coerced and gave his statements voluntarily.

¶ 13    On appeal, this court reversed the circuit court's denial of the petition finding that its ruling was not based on the evidence presented. *Harris I*, 2021 IL App (1st) 182172, ¶ 54. This court also found that the circuit court erred in relying on evidence outside of the record when it found that this case was a " 'heater case' " for support for its determination that the detectives would not want to " 'screw up the case.' " *Id.* This court further found that the circuit court ignored credible evidence that Detective McDermott, who was involved in Mr. Harris's arrest and interrogation, was allegedly involved in torture and abuse even after Jon Burge was fired. *Id.* ¶ 55. This court determined that the new evidence Mr. Harris presented was "of such character that the outcome of the suppression hearing would likely have changed if McDermott's testimony, and the testimony of other officers, had been subject to impeachment." *Id.* ¶ 57. The court noted that the purpose of the evidentiary hearing was to determine if the outcome of the suppression hearing would have been different if the officers who denied using physical coercion were subject to impeachment based on the new evidence of a pattern and practice of police abuse and not to determine the "ultimate issue" of whether Mr. Harris's confession was coerced. *Id.* ¶ 50.

¶ 14    This court concluded that the circuit's court ruling in denying the petitions was manifestly erroneous, and we remanded for a new suppression hearing. *Id.* ¶¶ 60, 64. This court also assigned the case to a different circuit court judge finding the original circuit court judge "ha[d] expressed a tendency to affirm the officers' credibility while giving little weight to defendant's new evidence." *Id.* ¶ 62.

¶ 15    On remand, the circuit court recognized that: "These matters are before the Court to conduct a new suppression hearing that's based on the Appellate Court granting the request for postconviction relief of the defendant/petitioner asking for a new suppression hearing. So we're here for a new suppression hearing."

¶ 16     At the suppression hearing, former Area 2 Detective James Boylan testified that he and his partner, Detective McDermott, arrested Mr. Harris pursuant to a warrant on August 29, 1995. Officers approached Mr. Harris with guns drawn and tackled him to the ground, but Detective Boylan did not see any of the officers hold a gun to Mr. Harris's head. While Mr. Harris was in custody, Detective Boylan executed a search warrant at Mr. Harris's address along with several other officers. The officers recovered .380 cartridges and holsters and pages of a catalog regarding .380 handguns. When Detective Boylan returned to the police station, he assisted in conducting lineups for the investigation. Detective Boylan denied abusing or threatening Mr. Harris and denied seeing any other officers abuse or threaten him.

¶ 17     Former Area 2 Detective John Hamilton testified that he was one of the officers who aided in the arrest of Mr. Harris in August 1995. Detective Hamilton testified that the officers entered the apartment with their guns drawn because they believed Mr. Harris was armed. After a struggle, Detective Hamilton wrestled Mr. Harris to the ground. Detective Hamilton noted that there was a gun pointed at Mr. Harris's left temple that left "scratches" near that area. Detective Hamilton did not hear any of the officers threaten Mr. Harris during the arrest. Detective Hamilton participated in the interrogation of Mr. Harris at the police station and also helped execute the search warrant at his home.

¶ 18     At the police station, Mr. Harris agreed to speak with Detective Hamilton and acknowledged that he committed murders in 1992. Detective Hamilton took handwritten notes detailing what Mr. Harris told him about the murders and both Detective Hamilton and Mr. Harris signed the notes. After taking the information from Mr. Harris, Detective Hamilton spoke to ASA Leslie Quade, who took additional statements from Mr. Harris about the murders. Before taking the statements, ASA Quade advised Mr. Harris of his *Miranda* rights (see *Miranda v. Arizona*, 384

U.S. 436 (1966)), and Mr. Harris acknowledged that while he was at the Area 2 police station, he had been provided with food, drinks, and cigarettes. Detective Hamilton denied ever threatening or abusing Mr. Harris and denied seeing anyone else threaten or abuse him. Detective Hamilton noted that Mr. Harris refused to speak with Detectives Boylan and McDermott.

¶ 19     The correctional medic at Cermak Health Services who conducted Mr. Harris's intake screening in August 1995 noted that, at the time of the screening, Mr. Harris did not have any physical injuries.

¶ 20     Former Area 2 Detective Linda Drozdek testified that she prepared a series of lineups at the Area 2 police station that included Mr. Harris. Detective Drozdek testified that during those lineups she did not observe any injuries to Mr. Harris, and he did not complain of any injuries or mistreatment.

¶ 21     Angela Alexander[1] testified that she was with Mr. Harris at her apartment at the time of his arrest in August 1995. When police arrived and knocked on the apartment door, Mr. Harris told her to not open the door because he did not want to go "back to jail." When the officers entered the apartment, Ms. Alexander was thrown to the floor and one of the officers pinned her down. Ms. Alexander was face down on the floor, so she could not see anything, but she heard the officers say, "[s]how us your hands," and she felt a gun being pressed into the back of her head. When she was allowed up off the floor, she observed Mr. Harris sitting on the kitchen floor in handcuffs. Ms. Alexander did not hear any of the officers threaten Mr. Harris during the arrest.

¶ 22     Ms. Alexander was taken to the Area 2 police station, where she was interviewed by detectives. She testified that none of the officers harmed or threatened her while she was at the

[1]Angela Alexander was Angela Clark at the time of Mr. Harris's arrest.

police station. After Ms. Alexander spoke to the detectives, she was permitted to leave the police station. A few days later, Ms. Alexander spoke to Mr. Harris on the phone. During the conversation, he never told her that the police had mistreated or threatened him. Ms. Alexander saw Mr. Harris in person a couple weeks later, and he likewise did not raise any complaints about his treatment from the officers.

¶ 23    ASA Thomas Darman testified that he took a statement from Mr. Harris following his arrest. ASA Darman asked Mr. Harris how he had been treated at the police station, and Mr. Harris responded that he had been treated "fine" and did not have any complaints. Mr. Harris did not complain of any injuries and was "conversational." Mr. Harris's statements about how he had been treated were memorialized in his handwritten statement to ASA Darman:

> "Harris states that he has been treated well by Assistant State's Attorney Thomas Darman, as well as by the Chicago Police. Harris states that he has been given pizza, bologna sandwiches to eat, several sodas to drink, and as many cigarettes as he wanted to smoke, and was allowed to use the bathroom whenever he wished.
>
> Harris states that no threats or promises have been given to him in return for this statement, and that he is giving this statement freely and voluntarily."

¶ 24    ASA Quade also took a statement from Mr. Harris at the Area 2 police station. When she first arrived at the police station, Mr. Harris stated that he wanted to speak to an attorney, and ASA Quade left the interview room. Mr. Harris later reinitiated contact with the detectives and agreed to speak to ASA Quade without an attorney present. Outside the presence of the detectives, ASA Quade asked Mr. Harris how he had been treated at the police station. Mr. Harris stated that he had been treated "well" and had been treated "especially" well by Detective Hamilton. ASA Quade

confirmed that Mr. Harris had eaten and had been permitted to smoke cigarettes. Mr. Harris gave inculpatory handwritten statements to both ASA Darman and ASA Quade.

¶ 25 The court also admitted the prior testimony of Detective Yucaitis, who was deceased at the time of the suppression hearing. Detective Yucaitis had previously testified at the original hearing on Mr. Harris's motion to suppress and had testified at Mr. Harris's trials. That testimony is recounted in Mr. Harris's previous appeals. See *Harris*, 358 Ill. App. 3d 1180. Detective Yucaitis testified consistently with the other Area 2 detectives and the ASAs regarding Mr. Harris's treatment at the police station.

¶ 26 Mr. Harris called Dr. Steven Miles, an expert in the area of "torture, particularly in the area of medical observation and evaluation." Dr. Miles testified that while Mr. Harris was at the Area 2 police station, he "possibly" suffered physical abuse or coercive treatment with the goal of securing his signature on legal documents. Dr. Miles testified that Mr. Harris was also subjected to sleep deprivation and stress and may have been subjected to "stealth torture," which includes physical abuse that does not leave a mark. Dr. Miles observed a photograph of Mr. Harris that depicted an abrasion on the left side of Mr. Harris's head that was taken near the time of his arrest. Dr. Miles testified that the injury depicted in the photograph was not consistent with a gun being held to the side of Mr. Harris's head during his arrest.

¶ 27 In order to support his contentions of a pattern and practice of torture at Area 2, Mr. Harris also presented testimony from two arrestees who had been interrogated and subject to physical and psychological torture at the Area 2 police station: Anthony Holmes and Joseph Carroll.

¶ 28    Mr. Harris did not testify at the hearing, but his testimony from the Patterson case was admitted into evidence as an exhibit.[2] Mr. Harris also offered numerous exhibits that he contended showed a pattern of practice of torture and abuse by Jon Burge and other detectives at Area 2.

¶ 29    In an oral ruling, the court found that the State had established the voluntariness of Mr. Harris's confession by a preponderance of the evidence and that Mr. Harris was not "physically, psychologically or mentally coerced into making statements." The court observed that there was testimony regarding the abrasion on the left side of Mr. Harris's face, but Mr. Harris never established that the injury occurred while he was in police custody. The court noted that the arrest was "physical" in that multiple officers entered the apartment with guns drawn and Detective Hamilton tackled Mr. Harris to the ground. The court believed that the injury could have happened during the arrest but determined that the injury was "insignificant" and was not inflicted as a means of obtaining a confession. Finally, the court found that Mr. Harris was properly questioned by detectives after he invoked his right to counsel when he reinitiated contact with the detectives. The court therefore denied the motion to suppress.

¶ 30    The court determined, however, that new trials were warranted because the defense was "significantly and unfairly prejudiced by the lack of information and knowledge of past misconduct attributed to a number of the detectives involved in the interrogation of Mr. Harris." The court found that the complaints of abuse were unknown to Mr. Harris and his defense counsels at his trials and the evidence would have allowed the triers of fact to consider his custodial statements in a different light. Accordingly, the court vacated Mr. Harris's convictions and ordered new trials. The State now appeals from that order. As our supreme court has now made clear,

_____

[2]This testimony is detailed in this court's order on Mr. Harris's direct appeal in the Patterson case. See *Harris*, 358 Ill. App. 3d 1180.

because this was a final order disposing of Mr. Harris's postconviction claim, we have jurisdiction to consider the merits of this appeal. Ill. Const. 1970, art. VI, § 6; 725 ILCS 5/122-7 (West 2022); Ill. S. Ct. R. 651(a) (eff. July 1, 2017).

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, The State asserts that the court exceeded its limited jurisdiction on remand by vacating Mr. Harris's convictions despite denying the motion to suppress. The State also contends that the circuit court erred in vacating Mr. Harris's convictions despite finding that his custodial statements were voluntarily made. The State maintains that following a new suppression hearing on a postconviction claim, new trials are not available as a form of relief if the court denies the motion to suppress. The State further contends that the court erred in *sua sponte* granting Mr. Harris relief on claims that were never addressed by the parties and had been abandoned by Mr. Harris earlier in the proceedings. In its supplemental briefing, the State asserts that the supreme court's opinion remanding the cause to this court supports these contentions.

¶ 33                        A. The Post-Conviction Hearing Act

¶ 34    Mr. Harris's claims were before the circuit court on his petitions under the Act (725 ILCS 5/122-1 *et seq.* (West 2016)). The Act provides a three-stage mechanism for criminal defendants to assert that their convictions were the result of a substantial denial of their federal or state constitutional rights. *People v. Agee*, 2023 IL 128413, ¶ 36. At the first stage, the circuit court may dismiss the petition if it finds that it is "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022). If the circuit court does not dismiss the petition, it advances to the second stage where the circuit court may appoint counsel, who may amend the petition, and the State may file a motion to dismiss the petition or answer the petition. *Id.* §§ 5/122-4, 122-5. At the second stage, "the circuit court must determine whether the petition and any accompanying documentation

make a 'substantial showing of a constitutional violation.' " *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).

¶ 35     If the petitioner makes the requisite showing at the second stage, the petitioner is entitled to a third-stage evidentiary hearing. 725 ILCS 5/122-6 (West 2022). At a third-stage evidentiary hearing, the circuit court serves as the fact finder, and is responsible for determining witness credibility, weighing the testimony and evidence, and resolving any conflicts in the evidence. *Domagala*, 2013 IL 113688, ¶ 34. "At this stage, the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief." *Id.* As with the other stages under the Act, the burden of proof is on the petitioner to demonstrate a denial of his constitutional rights by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 36     In remanding the case to this court, the supreme court clarified that the new suppression hearing in this case was a continuation of Mr. Harris's third-stage postconviction proceedings. *Harris*, 2025 IL 130351, ¶ 54. The court explained the procedure to be employed by the circuit court in conducting a suppression hearing on a coerced confession claim at a third-stage evidentiary hearing. The hearing is "substantially similar to a pretrial suppression hearing." *Harris*, 2025 IL 130351, ¶ 41.

"The same considerations are addressed but litigated in a different procedural posture. The court evaluates whether the confessions should have been suppressed based on the totality of the circumstances, considering the petitioner's new evidence, along with the evidence presented at the original proceedings as well as any new evidence presented by the State. And unlike a pretrial suppression hearing where the State bears the ultimate burden of proof by a preponderance of the evidence (*People v. Caballero*, 102 Ill. 2d 23,

33 (1984)), on collateral review, the petitioner bears the burden of proof by a preponderance of the evidence (*Coleman*, 2013 IL 113307, ¶ 92). The preponderance of the evidence is evidence that renders a fact more likely than not. *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007). Thus, a petitioner must establish that, based on the totality of the circumstances, it is more likely than not that the result of the suppression hearing would have been different had the new evidence been admitted, making the introduction of the confession at trial a violation of his constitutional rights." *Id.*

If the circuit court finds that a confession should have been suppressed and the error in failing to suppress the confession was not harmless, the petitioner is entitled to a new trial. *Id.* ¶ 42. With these principles in mind, we turn to the parties' arguments on appeal.

¶ 37                     B. Whether the Circuit Court's Order Vacating
                           Mr. Harris's Convictions and Ordering New
                           Trials is Void for Lack of Jurisdiction

¶ 38     The State first contends that the circuit court's order vacating Mr. Harris's convictions and ordering new trials was void for lack of jurisdiction because the order exceeded the scope of this court's mandate in *Harris I*. The *Harris I* mandate provided: "For the foregoing reasons, we reverse the circuit court's dismissal of [Mr. Harris's] petition after an evidentiary hearing and remand for a new suppression hearing." *Harris I*, 2021 IL App (1st) 182172, ¶ 64. The judgment line provided, "Reversed and remanded with directions." *Id.* ¶ 65. The State asserts that the *Harris I* mandate specified that it was remanding for a new suppression hearing, and the circuit court had no authority to vacate Mr. Harris's convictions and order new trials after it denied the motion to suppress.

¶ 39     In its supplemental briefing, the State maintains that the supreme court's opinion in this matter demonstrates that the circuit court's order vacating Mr. Harris's convictions was erroneous

and should be reversed. At the outset, we note that the supreme court specifically stated in its opinion: "We make no judgment about the propriety of the circuit court's order or the merits of the State's contentions on appeal." *Harris*, 2025 IL 130351, ¶ 54. Nonetheless, the State asserts that the supreme court's discussion of the facts and procedural history is relevant to the issues raised on appeal. For example, the State points out that the supreme court found the mandate in *Harris I* was "precise and unambiguous." *Id.* ¶ 47. The supreme court stated the *Harris I* mandate reversed the circuit court's dismissal of Mr. Harris's petition and remanded for a new suppression hearing. *Id.* The supreme court noted, however, that the mandate did not vacate Mr. Harris's convictions and remand for new trials and did not remand with directions for the circuit court to do so. *Id.* ¶ 47. The State maintains that this "clearly demonstrates" that the circuit court's order vacating Mr. Harris's convictions and ordering new trials was beyond the scope of the *Harris I* mandate, and, thus, that order is void for lack of jurisdiction.

¶ 40    Mr. Harris responds that when the *Harris I* court reversed the circuit court's judgment and remanded the matter for a new suppression hearing, jurisdiction revested in the circuit court for that court to enter any order that was expressed or implied by the mandate. Mr. Harris asserts that it is not necessary for the appellate court to specify in the mandate every potential action or order that the circuit court may take, and that by remanding for a new suppression hearing, this court acknowledged that the circuit court had the authority to grant new trials at the conclusion of that hearing. Mr. Harris acknowledges that the circuit court may not act in a manner that is inconsistent with the appellate court's mandate, but maintains that the circuit court's order here was implied by the mandate to conduct a new suppression hearing.

¶ 41    Briefly, we note that Mr. Harris contends that the State has waived this argument by failing to raise it before the circuit court. However, an argument that the judgment entered by a court is

void for lack of subject matter jurisdiction may be raised at any time and is not subject to forfeiture or other procedural restraints. *People v. Price*, 2016 IL 118613, ¶¶ 30-31. We will therefore address the merits of the State's contention that the circuit court's order is void because it exceeded the scope of the *Harris I* mandate.

¶ 42    When a reviewing court issues a mandate, it vests a trial court with jurisdiction only to take action that conforms with the mandate. *People v. Abraham*, 324 Ill. App. 3d 26, 30 (2001). "A trial court lacks the authority to exceed the scope of the mandate, and must obey precise and unambiguous directions on remand." *People v. Winters*, 349 Ill. App. 3d 747, 750 (2004) (citing *Abraham*, 324 Ill. App. 3d at 30). Although the trial court may only "do those things directed in the mandate," matters which are implied may be "considered embraced by the mandate." *PSL Realty Co. v. Granite Investment Company*, 86 Ill. 2d 291, 308 (1981).

¶ 43    Here, as the State points out, the supreme court found the mandate in *Harris I* was "precise and unambiguous." That is, it remanded the case for a new suppression hearing. Notably, the supreme court found that the *Harris I* court's remand for a new suppression hearing was erroneous "procedural process." *Harris*, 2025 IL 130351, ¶ 54. The *Harris I* court essentially remanded for a "fourth stage" postconviction proceeding, which is not proper under the Act. *Id.* ¶ 49. Instead, the third-stage proceeding functions as a "*de facto* suppression hearing." *Id.* Nonetheless, the supreme court found that "both the parties and the [circuit] court understood that the matter was remanded for continued proceedings on [Mr.] Harris's coerced confession claim and that the appellate court had not vacated his convictions and remanded for new trials." *Id.* ¶ 53.

¶ 44    We note that the correctness of the circuit court's action on remand is to be determined from the appellate court's mandate, as opposed to the appellate court opinion. *PSL Realty*, 86 Ill. 2d at 308. However, the content of the opinion is significant where the mandate directs the court

to procced in conformity with the opinion. *Id.* In this case, the judgment line in *Harris I* stated, "Reversed and remanded with directions." *Harris I*, 2021 IL App (1st) 182172, ¶ 65. Those directions were to assign the case to a new circuit court judge on remand and for the circuit court to conduct a new suppression hearing to determine if the new evidence presented in the petition warranted suppression of Mr. Harris's confession.

¶ 45   Thus, the *Harris I* decision is clear that the only issue to be addressed by the circuit court on remand was to determine, after a new suppression hearing, whether Mr. Harris's confessions should be suppressed based on the new evidence presented in his postconviction petition of police misconduct and abuse at Area 2. "Rather, the sole issue before the circuit court was whether the outcome of [Mr. Harris's] *suppression hearing* would have been different if the officers who denied using physical coercion had been subject to impeachment based on defendant's evidence showing a pattern and practice of police abuse." (Emphasis added.) *Harris I*, 2021 IL App (1st) 182172, ¶ 50.

¶ 46   At the conclusion of the new suppression hearing, the circuit court gave a lengthy oral ruling explaining why it denied the motion to suppress, but nonetheless vacated Mr. Harris's convictions and granted new trials. The court found that the State established the voluntariness of Mr. Harris's confession by a preponderance of the evidence[3], that Mr. Harris's statements were not the product of police coercion, and that Mr. Harris was not physically, psychologically, or mentally coerced into making statements. After denying the motion to suppress, the circuit court wondered aloud: "Does the denial of the motion to suppress statement preclude the ordering of a

---

[3]As noted above, the supreme court clarified that the burden at the hearing was on Mr. Harris, not the State, to prove by a preponderance of the evidence that, based on the totality of the circumstances, the result of his suppression hearing would have been different if the court had been presented with the new evidence. *Harris*, 2025 IL 130351, ¶ 41.

new trial?" The court found that in Mr. Harris's original trials, the defense was "severely limited in impeaching the detectives involved in this investigation undermining the [defense's] ability to fully and thoroughly attack the statements attributed to [Mr. Harris]." The court found that the defense was significantly and unfairly prejudiced by the lack of information of past misconduct attributed to the detectives involved in Mr. Harris's interrogation, and new trials would allow the trier of fact to consider evidence of other alleged acts of coercion to obtain confessions. Essentially, the court found that although the new evidence presented was not sufficient to undermine the State's evidence that Mr. Harris's confessions were freely and voluntarily given, the evidence could potentially bear on the weight and credibility of the confessions if presented to the trier of fact at a new trial. The court granted the new trials on the basis that Mr. Harris should have the opportunity to present this new evidence to the trier of fact at trial.

¶ 47    We observe that the *Harris I* mandate and the text of the opinion are silent on the issue of whether the circuit court should order a new trial only if it grants the motion to suppress. In similar circumstances, both this court and the supreme court have specifically provided that on remand for a new posttrial suppression hearing to the determine the voluntariness of the defendant's confession, the circuit court should vacate the defendant's conviction and order a new trial *only if* it grants the motion to suppress; but if it finds that the confession is voluntary, it should enter a new judgment of conviction. *People v. King*, 61 Ill. 2d 326, 330 (1975) ("If [the defendant's statement] is found to have been voluntary and therefore admissible, the circuit [court] will enter a new judgment of conviction. If it is found not to have been voluntary, the circuit court will vacate the judgment of conviction and order a new trial."); *People v. Brooks*, 115 Ill. 2d 510, 514 (1987) (*overruled on other grounds by People v. R.D.,* 155 Ill. 2d 122, 184 (1993)) ("It may be noted that in similar cases the appellate court, in remanding the cause for a new suppression hearing under

the rule in [*King*], has instructed the trial court to conduct a new trial only if the suppression motion is allowed."); *People v. Tucker-El*, 123 Ill. App. 3d 955, 959 (1984) ("Our conclusion does not require that defendant's conviction be reversed, however, but that it be remanded for a new, full hearing on the voluntariness and admissibility of defendant's confession. [citations]. If after hearing defendant's confession is found to be voluntary and admissible, the trial court should enter a new judgment of conviction. If the confession is not determined to have been voluntary, the court will vacate the judgment of conviction and grant defendant a new trial."); *People v. Parquette*, 123 Ill. App. 3d 233, 238 (1984) ("If, after [a new suppression] hearing, defendant's statement is found to have been voluntary and therefore admissible, the trial court should enter a new judgment of conviction. If defendant's statement is found not to have been voluntary, the circuit court should vacate the judgment of conviction and order a new trial."); *In re J.C.*, 69 Ill. App. 3d 289, 293 (1979) ("Therefore, we remand this cause to the Circuit Court of Will County for a new full and complete hearing on the admissibility of respondent's confession. Both parties will have an opportunity to present further evidence. If the confession is held inadmissible, the trial court will vacate the judgment and grant respondent a new adjudicatory hearing. If the confession is held admissible, a new order finding respondent delinquent and making him a ward of the court will be entered.").

¶ 48    Mr. Harris asserts that the lack of this limiting language in *Harris I* permitted the circuit court to grant new trials even if it denied the motion to suppress and the court's authority to order new trials was "necessarily implied by the mandate for a 'a new suppression hearing' in the postconviction context."

¶ 49    However, consistent with the precedent cited above, our supreme court has long recognized that when the circuit court conducts a posttrial hearing on the voluntariness of the defendant's

- 19 -

confession, the court should order a new trial only if the confession is found to be inadmissible. *People v. Taylor*, 33 Ill. 2d 417, 424-25 (1965). In *Taylor*, the supreme court remanded for a new suppression hearing after the trial court failed to conduct a suppression hearing when the defendant made a posttrial objection to the admission of his confession. *Id.* 421-22, 425. On remand, the trial court conducted a suppression hearing and determined that the confessions were made voluntarily and entered a new judgment of conviction in accordance with the supreme court's order. *People v. Taylor,* 40 Ill. 2d 569, 570-71 (1968). The case once again came before the supreme court where the defendant argued, *inter alia*, that the procedure of conducting a posttrial hearing on voluntariness denied him due process of law because he was unable to use statements made by witnesses at the hearing to impeach their testimony at trial, as he would have been if the hearing was held prior to trial. *Id.* 575. In rejecting that claim, the supreme court cited with approval the United States Supreme Court's ruling in *Jackson v. Denno*, 378 U.S. 368 (1964). *Id.* at 575-76.

¶ 50    In *Jackson*, the defendant filed a petition for *habeas corpus* in federal court asserting that his conviction in New York state court was invalid because it was based upon a confession that was not properly determined to be voluntary. *Jackson*, 378 U.S. 368 at 369-70. At the defendant's state court trial, defense counsel raised questions regarding the voluntariness of the defendant's confession. *Id.* at 374. Consistent with New York state law practice, the question regarding the voluntariness of the confession was submitted to the jury. *Id.* "The jury was told that if it found the confession involuntary, it was to disregard it entirely, and determine guilt or innocence solely from the other evidence in the case; alternatively, if it found the confession voluntary, it was to determine its truth or reliability and afford it weight accordingly." *Id.* at 374-75. The jury found the defendant guilty. *Id.* at 375.

¶ 51    The Supreme Court found that the defendant had not been given an adequate hearing to determine the voluntariness of his confession. *Id.* at 391. The Court determined that the appropriate remedy was for the New York state court to conduct such a hearing. *Id.* at 393-94. "It does not follow, however, that [the defendant] is automatically entitled to a complete new trial including a retrial of the issue of guilt or innocence." *Id.* at 394. The Court explained that:

> "[I]f at the conclusion of such an evidentiary hearing in the state court on the coercion issue, it is determined that [the defendant's] confession was voluntarily given, admissible in evidence, and properly to be considered by the jury, we see no constitutional necessity at that point for proceeding with a new trial, for [the defendant] has already been tried by a jury with the confession placed before it and has been found guilty. True, the jury in the first trial was permitted to deal with the issue of voluntariness and we do not know whether the conviction rested upon the confession; but if it did, there is no constitutional prejudice to [the defendant] from the New York procedure if the confession is now properly found to be voluntary and therefore admissible. If the jury relied upon it, it was entitled to do so. Of course, if the state court, at an evidentiary hearing, redetermines the facts and decides that [the defendant's] confession was involuntary, there must be a new trial on guilt or innocence without the confession's being admitted in evidence." *Id.*

The Court continued, "But as to [the defendant], who has already been convicted and now seeks collateral relief, we cannot say that the Constitution requires a new trial if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary." *Id.* at 395-96.

¶ 52    Thus, our supreme court precedent and the Court's ruling in *Jackson* belie Mr. Harris's assertion that the circuit court had the implicit authority to grant new trials despite denying the

motion to suppress. While it could safely be said that the circuit court's authority to vacate Mr. Harris's convictions and order new trials in the event it granted his motion to suppress could be inferred from the *Harris I* mandate despite the *Harris I* court's omission of that specific instruction, the same inference is clearly not warranted where, as here, the court denied the motion to suppress.

¶ 53    We further find Mr. Harris's reliance on *People v. Gonzalez*, 407 Ill. App. 3d 1026 (2011) unpersuasive. In *Gonzalez*, the defendant filed a postconviction petition alleging that he was entitled to a new trial based on newly discovered evidence of his actual innocence. *Id.* at 1029. The circuit court granted the State's motion to dismiss the petition at the second stage of proceedings. *Id.* The second district appellate court reversed, and remanded the cause to the circuit court for a third-stage evidentiary hearing. *Id.* at 1029-30; see *People v. Gonzalez,* No. 2-01-1329, slip op. at 7, 342 Ill. App. 3d 1113 (2003) (unpublished order under Supreme Court Rule 23).

¶ 54    On remand, the circuit court permitted the defendant to file an amended postconviction petition where the defendant raised a new ground of relief, namely, that his trial counsel was ineffective in failing to call an alibi witness. *Id.* at 1030. The circuit court held an evidentiary hearing where it considered the defendant's claims in his original and amended petitions. *Id.* at 1033-34. The court ultimately denied the petition and the defendant appealed. *Id.* at 1034.

¶ 55    On appeal, the defendant contended, *inter alia*, that the circuit court erred in rejecting his claim that his trial counsel was ineffective in failing to call the alibi witness. *Id.* at 1037. The State responded that the circuit court erred in permitting the defendant to amend his postconviction petition because the trial court's jurisdiction on remand was limited to holding an evidentiary hearing regarding the actual innocence claim. *Id.* The appellate court rejected the State's argument finding that the mandate in the prior appeal was "general." *Id.* The mandate stated, " '[I]n accordance with the views expressed in the attached Decision the judgment of the trial court is

Vacated and Remanded.' " *Id.* The order also provided that the case was " 'vacated and remanded for an evidentiary hearing on the defendant's postconviction petition.' " *Id.* at 1037-38 (quoting *Gonzalez*, No. 2-01-1329, slip op. at 7). The court found that the circuit court's decision to allow the defendant to amend his postconviction petition and present a new claim did not exceed the mandate because the appellate court did not dictate the scope of the evidentiary hearing. *Id.* at 1038.

¶ 56    Here, unlike the "general" mandate in *Gonzalez*, the *Harris I* mandate was "precise and unambiguous." *Harris*, 2025 IL 130351, ¶ 47. *Harris I* did not remand for further proceedings on Mr. Harris's postconviction petition in general, but remanded solely for a suppression hearing based on Mr. Harris's claim that his confession should have been suppressed. Notably, Mr. Harris did raise other claims in postconviction petition, including that his trial counsel was ineffective for failing to investigate and introduce evidence of Detective McDermott's history of coercion, but Mr. Harris did not raise those claims on appeal in *Harris I* and solely challenged the circuit court's ruling on his coerced confession claim. Accordingly, *Harris I* addressed only that claim and remanded solely for the circuit court's consideration of that claim at a suppression hearing. Mr. Harris was not foreclosed, on remand, from raising additional claims in support of his contention that his confession should be suppressed, and the circuit court was not foreclosed from considering those claims. But the *Harris I* mandate limited the circuit court's authority to vacate Mr. Harris's convictions only if it determined that his confession should be suppressed.

¶ 57    Simply put, the *Harris I* court remanded to the circuit court to conduct a new suppression hearing to determine if Mr. Harris's confession was properly admitted at his trials. At the conclusion of Mr. Harris's new suppression hearing, the circuit court determined that Mr. Harris's confession was voluntarily given, admissible in evidence, and properly considered by the trier of

fact at his trials. The circuit court therefore addressed the question to be considered on remand, finding that, based on the totality of the circumstances, the result of Mr. Harris's suppression hearing would not have been different if he presented this new evidence. At that point, the circuit court had satisfied its jurisdiction on remand, and its subsequent order vacating Mr. Harris's convictions and ordering new trials exceeded that jurisdiction. Accordingly, we find that the circuit court's order vacating Mr. Harris's convictions and ordering new trials is void for lack of jurisdiction and we vacate that order. See *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276-77 (1982).

¶ 58                                C. Whether the Circuit Court Erred
                                     In Denying the Motion to Suppress

¶ 59    Having found that the circuit court exceeded its jurisdiction on remand, we need not address the State's remaining arguments that the court erred in vacating Mr. Harris's convictions and granting new trials after denying the motion to suppress. Mr. Harris contends, however, that in the event we find that the court erred in vacating his convictions and ordering new trials, we should nonetheless affirm the circuit court's ruling because the court erred in denying the motion to suppress. Mr. Harris asserts that in denying his motion to suppress, the court ignored the "negative outcome" dictated by the negative inference it adopted based on Detective McDermott's failure to testify at the hearing. He further contends that the court erred in engaging in speculation regarding the injury to his temple, and that the court erred in admitting Detective Yucaitis's prior testimony where Mr. Harris did not have the opportunity to cross-examine Detective Yucaitis regarding the newly discovered evidence of police abuse and torture presented in the petition.

¶ 60    Notably, none of Mr. Harris's arguments address whether he satisfied his burden to show that it was more likely than not, based on the totality of the circumstances, that the result of his suppression hearing would have been different had the new evidence been admitted, making the

introduction of the confession at trial a violation of his constitutional rights. *Harris*, 2025 IL 130351, ¶ 41. Similarly, none of his arguments assert that the alleged error in admitting his confession was not harmless. *Id.* ¶ 42. Instead, Mr. Harris's contentions primarily challenge the sufficiency of the State's evidence at the hearing. Mr. Harris repeats these contentions in his supplemental brief despite the guidance from the supreme court regarding the procedure and burden of proof at a suppression hearing under the Act. Nonetheless, we will evaluate Mr. Harris's contentions to determine whether the circuit court erred in denying the motion to suppress. We review the circuit court's decision to deny relief following an evidentiary hearing under the Act for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.*

¶ 61    Mr. Harris first contends that the circuit court erred in denying his motion to suppress because, despite adopting a negative inference based on Detective McDermott's failure to testify at the new suppression hearing, the court did not adopt the "necessary outcome" dictated by that inference. Mr. Harris asserts that the only possible conclusion based on the court's negative inference is that, if Detective McDermott had testified, he would have admitted to torturing Mr. Harris to obtain his confession.

¶ 62    "As a general rule, if a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and the witness's relationship with the State is such that he would ordinarily be expected to favor it, the State's failure to call the witness may give rise to a permissible inference that, if the witness were called, the witness's testimony would have been unfavorable to the State's case." *People v. Doll*, 371 Ill. App. 3d 1131, 1137 (2007).

¶ 63    Whether Detective McDermott would testify was an issue throughout the hearing. The parties repeatedly discussed whether Detective McDermott would appear, and the circuit court indicated that it would like to hear his testimony. The State noted that Detective McDermott had repeatedly invoked the fifth amendment when called as a witness in other cases concerning the new evidence of abuse at Area 2. After the State informed the court that it would not call Detective McDermott, the State argued that Mr. Harris was not entitled to a negative inference based on Detective McDermott's failure to testify because Mr. Harris could have subpoenaed Detective McDermott but chose not to do so. Defense counsel argued that, based on the *Harris I* court's discussion of Detective McDermott, the State's failure to call Detective McDermott was "dispositive."

¶ 64    During its oral ruling following the suppression hearing, the circuit court stated:

> "Detective Michael McDermott never testified at this hearing. His silence is deafening. He never denied at this hearing any of the allegations that Ralph Harris made. Harris didn't make them at this hearing. Harris did not testify at this motion to suppress but at the jury trial decades ago.
>
> McDermott—and I haven't read through his transcript at the previous trials—may have denied it previously but he has not come to court at this hearing, he has not come to court at this motion, he has not made any denials of the allegations against him. I find this silence deafening.
>
> I draw a negative inference and conclusion from Detective McDermott's failure to testify at this hearing. I also consider the evidence of a pattern and practice of torture and physical abuse at Area 2 involving Detective McDermott including the cases of Alphonso

> Pinex, P-I-N-E-X, and Tony Anderson among others and I draw a negative inference from those."

Despite drawing this negative inference from Detective McDermott's failure to testify, the court nonetheless denied the motion to suppress. We find that the court did not err in denying the motion to suppress despite adopting a negative inference from Detective McDermott's failure to testify.

¶ 65    First, we note that the court is not required to draw a negative inference from the State's failure to call a witness, particularly where, as here, the witness is known and available to the defense. *People v. Irby*, 237 Ill. App. 3d 38, 69 (1992) (stating that "no negative inference is raised when the witness is also known and available to the defense yet is not called by it."). The State contended before the circuit court and in its briefs before this court that the circuit court should not have adopted a negative inference because Mr. Harris could have subpoenaed Detective McDermott but chose not to do so. Mr. Harris did not explain either before the circuit court or this court why he did not subpoena Detective McDermott.

¶ 66    In any event, the State may accept the risk of a negative inference from the absence of a witness so long as it otherwise satisfies its burden. *Id.* The procedural posture of this case presents unique considerations regarding the negative inference drawn based on the failure to call a witness. Typically, the burden is on the State, and the State may overcome the negative inference by presenting sufficient evidence to satisfy its burden despite the negative inference. See, *e.g.*, *Id.*, *Doll*, 371 Ill. App. 3d at 1138; *People v. Jimerson*, 69 Ill. App. 3d 403, 412 (1979). In this case, however, even if the circuit court did not recognize it, the burden at the suppression hearing was on Mr. Harris. Mr. Harris was required to establish that it was more likely than not that the result of his suppression hearing would have been different if the new evidence had been admitted. The State was not required to prove the voluntariness of Mr. Harris's confessions as it would have been

at a pretrial suppression hearing, and thus the negative inference cannot be dispositive as Mr. Harris suggests. Mr. Harris was still required to present sufficient evidence to satisfy his burden. The circuit court found that he failed to do so, a finding that Mr. Harris does not challenge.

¶ 67     We also observe that the supreme court directly addressed the *Harris I* court's suggestion that Mr. Harris's new evidence was of such a conclusive character that the outcome of the suppression hearing likely would have been different if Detective McDermott had been subject to impeachment based on the new evidence. *Harris I*, 2021 IL App (1st) 182172, ¶ 60. The supreme court specifically stated that whether any of the officers who interrogated Mr. Harris may have participated in the abuse at Area 2 and whether those officers' credibility at the suppression hearing would have been impeached as a result are "relevant considerations" for the circuit court in determining whether the confession should have been suppressed, but they are not sufficient, standing alone, for the circuit court to order a new trial. *Harris*, 2025 IL 130351, ¶¶ 51-52. "It is not enough to merely show that the new evidence would have impeached the credibility of the interrogating detectives." *Id.*  ¶ 52. Instead, "the ultimate question on a coerced confession claim is whether it was involuntary under the totality of the circumstances." *Id.* Here, the court found that Mr. Harris failed to satisfy his burden as to the "ultimate question" despite adopting the negative inference. We cannot say that such a finding was manifestly erroneous.

¶ 68     Mr. Harris next contends that the circuit court erred in denying the motion to suppress where it engaged in impermissible speculation regarding the source of the injury to Mr. Harris's temple. At the hearing, there was conflicting evidence presented regarding an abrasion that Mr. Harris suffered to his left temple. Mr. Harris asserts that the State was required to show by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. Again, Mr. Harris fails to acknowledge that he, not the State, bore the burden at the suppression

hearing on remand. Moreover, the court's "speculation" that the injury to Mr. Harris's temple may have occurred during his arrest was not improper. Two witnesses, including one of the officers involved in Mr. Harris's arrest, testified about the physical nature of arrest where Mr. Harris was tackled to the ground. Even the officer who testified that he did not see a gun held to Mr. Harris's head during the arrest acknowledged that the officers had their guns drawn and everyone "went down to the ground in a pile." In any event, the court found the "mark or abrasion" was "insignificant" and Mr. Harris failed to establish that the injury occurred while in police custody or that it was inflicted as a means of obtaining a confession. Thus, the court's finding that the injury to Mr. Harris's temple could have occurred during his arrest is not manifest error.

¶ 69    Finally, Mr. Harris asserts that the court erred in admitting Detective Yucaitis's prior testimony because Mr. Harris did not have the opportunity to cross-examine Detective Yucaitis regarding the new evidence and impeach his testimony. Detective Yucaitis, who was involved in Mr. Harris's interrogation and was alleged to be one of the detectives involved in the pattern and practice of abuse and torture at Area 2 had testified at Mr. Harris's original suppression hearing and his trials, but was deceased at the time of the new suppression hearing. The circuit court granted the State's motion to introduce Detective Yucaitis's prior testimony finding that the testimony was material, had probative value, and the issues raised at the original suppression hearing and the new suppression hearing were identical. The court acknowledged that Mr. Harris did not have the opportunity to cross-examine Detective Yucaitis regarding the allegations of misconduct at the original suppression hearing, but noted that it had allowed Mr. Harris to present information from other defendants who had raised allegations of abuse by Detective Yucaitis. The court determined that this evidence served to impeach Detective Yucaitis's prior testimony even

if Mr. Harris was precluded from "a classic impeachment of the person denying it, and then bringing in another witness that says that, no, that did happen."

¶ 70    Mr. Harris asserts that the court erred in admitting this testimony because he did not have the opportunity to cross-examine Detective Yucaitis regarding the new evidence of the pattern and practice of police torture and abuse at Area 2 and his participation in that torture. "We note that the circuit court has wide discretion to limit the type of evidence it will admit at a post-conviction evidentiary hearing." *People v. Coleman*, 206 Ill. 2d 261, 278 (2002). We will not reverse a circuit court's ruling on the admission of evidence absent an abuse of that discretion. *People v. Jones*, 2012 IL App (1st) 093180, ¶ 52. A circuit court abuses its discretion when its evidentiary rulings are "arbitrary, fanciful or unreasonable" or when "no reasonable [person] would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.* (quoting *People v. Donoho*, 204 Ill. 2d 159, 182 (2003)).

¶ 71    Here, we cannot say that the circuit court abused its discretion in admitting Detective Yucaitis's prior testimony. The court acknowledged that Mr. Harris would be unable to cross-examine Detective Yucaitis with the new evidence, but nonetheless found that Detective Yucaitis's prior testimony was impeached, in a sense, by the evidence. The court explained that this impeachment would affect the weight it would give the prior testimony. At an evidentiary hearing under the Act, it is the responsibility of the circuit court to act as the finder of fact, to resolve any conflicts in the evidence, and determine the credibility of the witnesses and the weight to be given to their testimony. *Domagala*, 2013 IL 113688, ¶ 34. It was therefore within the discretion of the circuit court whether to admit Detective Yucaitis's prior testimony and determine how that prior testimony would be weighed in light of the new evidence Mr. Harris presented in his petition. Accordingly, we find that the circuit court did not abuse its discretion in admitting the testimony.

¶ 72    We therefore reject Mr. Harris's contention that the circuit court erred in denying the motion to suppress. Having found that the circuit court did not err in denying the motion to suppress, but the court did err in vacating Mr. Harris's convictions and ordering new trials despite denying the motion to suppress, the appropriate remedy in this case is to vacate the portion of the circuit court's judgment vacating Mr. Harris's convictions and ordering new trials and to reinstate Mr. Harris's convictions and sentences.

¶ 73                              III. CONCLUSION

¶ 74    For the reasons stated, we affirm the circuit court's denial of Mr. Harris's motion to suppress but vacate the portion of the circuit court's judgment that vacated Mr. Harris's convictions and ordered new trials. We reinstate Mr. Harris's convictions and sentences.

¶ 75    Affirmed in part and vacated in part.